LITCHFIELD ASSET MANAGEMENT CORPORATION
*v.* MARY ANN HOWELL ET AL.
(AC 21465)

Lavery, C. J., and Schaller and Peters, Js.

134

Argued November 27, 2001—officially released June 4, 2002

*Scott M. Charmoy*, for the appellants (named defendant et al.).

*J. Daniel Sagarin*, with whom was *Margaret E. Haering*, for the appellant (defendant Jon Howell).

*Michael S. McKenna*, for the appellee (plaintiff).

*Opinion*

LAVERY, C. J. The defendants[1] appeal from the trial court's judgment awarding damages and injunctive relief to the plaintiff, Litchfield Asset Management Corporation. The defendants claim that the court improperly (1) awarded damages to the plaintiff after

---

[1] The defendants are Jon Howell and Mary Ann Howell, who are husband and wife, and the two limited liability companies, Mary Ann Howell Interiors and Architectural Design, LLC, and Antiquities Associates, LLC, through which Mary Ann Howell managed her interior design business during the times relevant to this appeal.

concluding that the defendants Mary Ann Howell and Jon Howell, by transferring Mary Ann Howell's personal funds to and between the defendant corporate entities, engaged in a conspiracy to defraud the plaintiff by preventing it from collecting on an earlier judgment against Mary Ann Howell and (2) disregarded the separate existence of the corporate entities so as to hold them liable for the individual debt of Mary Ann Howell. We affirm the judgment of the trial court insofar as it holds the corporate entities liable for the personal debt of Mary Ann Howell, but reverse the judgment as to the finding of a conspiracy and the award of damages thereon.

The following facts and procedural history are relevant to our disposition of the appeal. Mary Ann Howell has worked for approximately thirty years in the field of interior design. In 1993, operating through the now defunct Mary Ann Howell Interiors, Inc. (Interiors), she entered into an agreement to perform services for the plaintiff at its facilities in Texas. In 1995, the plaintiff brought an action in a Texas court against Mary Ann Howell and Interiors based on disputes arising from the agreement. Mary Ann Howell and Interiors unsuccessfully objected to the Texas court's jurisdiction and, thereafter, failed to defend against the plaintiff's claims. In July, 1996, the Texas court entered a default judgment against Mary Ann Howell and Interiors in the amount of $657,207 plus interest. In December, 1996, the plaintiff brought an action in the Connecticut Superior Court to enforce the Texas judgment. In February, 1997, the Connecticut trial court rendered a judgment in favor of the plaintiff in the amount of $657,207 plus interest. That judgment was affirmed on appeal in December, 1997. *Litchfield Asset Management Corp.* v. *Howell*, 47 Conn. App. 920, 703 A.2d 1192 (1997).

While the aforementioned proceedings were unfolding, Mary Ann Howell and her family members formed two new limited liability companies, Mary Ann

Howell Interiors and Architectural Design, LLC (Design), and Antiquities Associates, LLC (Antiquities). In May, 1996, Mary Ann Howell contributed $144,679, which she obtained by borrowing against her life insurance policies, in exchange for a 97 percent ownership interest in Design. Jon Howell and the couple's two daughters, Marla Howell and Wendi Howell, each contributed $10 in exchange for a 1 percent ownership interest. In November, 1997, Design contributed $102,901 for a 99 percent interest in Antiquities, and Mary Ann Howell contributed $10 for the remaining 1 percent.

On May 11, 1998, the plaintiff commenced the present action against Mary Ann Howell, Jon Howell, Design and Antiquities. The plaintiff alleged that Mary Ann Howell and Jon Howell had formed Design, a "mere shell," and used it "to perpetrate a fraud or promote injustice by preventing the plaintiff from collecting on its judgment against Mary Ann Howell." It also alleged that Mary Ann Howell and Jon Howell, by forming Antiquities and causing Design to transfer $102,901 to Antiquities, created another entity that "serv[ed] no legitimate purpose" but fraudulently or unjustly to prevent the collection of the plaintiff's judgment. Last, the plaintiff alleged that Mary Ann Howell and Jon Howell, by forming Design and Antiquities, and transferring Mary Ann Howell's personal assets into and between them, wilfully, wantonly and maliciously conspired to fraudulently divert those assets beyond the plaintiff's reach as a judgment creditor, resulting in monetary damage to the plaintiff.

On the first and second counts, the plaintiff sought a judgment declaring that Design and Antiquities were alter egos of Mary Ann Howell, "established and operated so as to avoid the just debt owed the plaintiff," and enjoining Design and Antiquities from transferring or encumbering their assets until the plaintiff's judg-

ment is satisfied. On the third count, the plaintiff sought damages, punitive damages, attorney's fees and an order enjoining Mary Ann Howell and Jon Howell from transferring or encumbering the assets of, or income or profits derived from, Design or Antiquities.

The case was tried to the court on May 25, 2000, and May 31, 2000. The following facts were admitted, stipulated to by the parties or reasonably found by the court on the basis of the evidence presented. Mary Ann Howell is the general manager of both Design and Antiquities. Neither company has any employees; those who provide services for the companies have independent contractor status. Both companies operate out of a loft space above the garage at Jon Howell and Mary Ann Howell's personal residence. Neither company pays any rent to Jon Howell, owner of the premises, for its use. Mary Ann Howell exercised complete control over the policies, finances and business practices of Design and Antiquities; there is no indication in the record that Jon Howell, Wendi Howell or Marla Howell participated in their operation in any significant way.

Mary Ann Howell has never drawn a salary or received regular distributions from either Design or Antiquities, but consistently has used company funds to pay for many personal expenses and to provide substantial, interest free loans or gifts to family members. For example, between 1997 and 2000, Design or Antiquities funds were used to pay more than $17,000 of Mary Ann Howell's medical expenses; to pay $11,450 of Mary Ann Howell's brother's personal expenses, of which only $2200 has been reimbursed; to purchase a $1489 computer for Marla Howell; to pay Mary Ann Howell's $3500 credit card bill; and to loan $5000 to Wendy Howell and $1500 to Jon Howell. Company funds also were used to repay an $8247 loan on a vehicle to which Jon Howell held title and to purchase a pool table for $4000 that was given to Jon Howell.

Although Design and Antiquities maintained separate bank accounts, payments for Antiquities' sales were deposited into Design's account without a corresponding reimbursement from Design to Antiquities. The records of the two companies were segregated to some extent for tax purposes, though tax returns were not filed for either company for the two years preceding trial.

After considering the evidence, the court concluded that the requisite legal tests had been satisfied such that Design and Antiquities were but alter egos of Mary Ann Howell and thus were liable for her personal debt owed to the plaintiff. It also found that there was "credible" evidence to support the plaintiff's claim of civil conspiracy, holding that "Mary Ann Howell and Jon Howell had conspired to shield their assets from the plaintiff and did so by transferring assets to Design and Antiquities, and that the plaintiff was damaged because it was unable to collect upon its judgment." The court granted the equitable relief requested by the plaintiff and awarded the plaintiff $163,260 in monetary damages[2] and $21,682 in punitive damages.[3] Additional facts will be set forth as necessary.

I

The defendants claim that the court improperly awarded damages after concluding that they had conspired to commit fraud against the plaintiff. The defendants make a number of arguments in this regard.[4]

[2] That figure represents Mary Ann Howell's original investment in Design plus the amount Design paid for the vehicle titled to Jon Howell. The court specified that the monetary damages were to be paid in partial satisfaction of the debt owed the plaintiff by virtue of its earlier judgments against Mary Ann Howell.

[3] That figure represents the plaintiff's attorney's fees.

[4] The defendants argue that "A. The trial court erred in imposing liability on a civil conspiracy claim created to evade clear limits on plaintiff's ability to recover against a party without liability on the underlying judgment [and] B. The trial court erred in holding defendants liable for civil conspiracy [because] 1. The trial court erred in finding liability for conspiracy because

Because we agree with and find dispositive their claim that the court applied the wrong standard of proof in evaluating the plaintiff's conspiracy claim, we need not address the remainder of the defendants' arguments. We will, however, also address briefly the defendants' claims that the court improperly held Jon Howell liable for damages resulting from the alleged conspiracy and improperly awarded punitive damages because those issues are likely to arise in a retrial.

A

The defendants claim that the court applied the wrong standard of proof to the plaintiff's conspiracy claim. We agree.

We note at the outset our standard of review. "The issue of whether the court held the parties to the proper standard of proof is a question of law. When issues in [an] appeal concern a question of law, this court reviews such claims de novo." (Internal quotation marks omitted.) *Selvaggi* v. *Miron*, 60 Conn. App. 600, 601, 760 A.2d 539 (2000); *Satti* v. *Kozek*, 58 Conn. App. 768, 771, 755 A.2d 333, cert. denied, 254 Conn. 928, 761 A.2d 755 (2000); see also *South Windsor* v. *South Windsor Police Union Local 1480*, 57 Conn. App. 490, 500, 750 A.2d 465 (2000), rev'd on other grounds, 255 Conn. 800, 770 A.2d 14 (2001).

"The contours of a 'civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or

plaintiff failed to allege or prove any damages as a result thereof . . . 2. Liability for civil conspiracy cannot be established without combination to do an unlawful act or a lawful act by unlawful means . . . 3. The trial court erred in holding Jon Howell liable on plaintiff's judgment against his wife . . . 4. The trial court applied the incorrect standard of proof in deciding the conspiracy claim . . . [and] 5. [The] trial court erred in assessing punitive damages on the conspiracy count."

more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.' *Williams* v. *Maislen,* 116 Conn. 433, 437, 165 A. 455 (1933)." *Marshak* v. *Marshak,* 226 Conn. 652, 665, 628 A.2d 964 (1993), overruled on other grounds, *State* v. *Vakilzaden,* 251 Conn. 656, 660, 742 A.2d 767 (1999).

Under Connecticut law, technically speaking, "there is no such thing as a civil action for conspiracy. The action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." *Cole* v. *Associated Construction Co.,* 141 Conn. 49, 54, 103 A.2d 529 (1954); see also 16 Am. Jur. 2d 275–76, Conspiracy § 50 (1998). A claim of civil conspiracy, therefore, is "insufficient unless based on some underlying cause of action . . . ." (Citations omitted.) *Marshak* v. *Marshak,* supra, 226 Conn. 665. Consequently, for a plaintiff to recover on a conspiracy claim, the court must "find the facts necessary to satisfy the elements of an independent underlying cause of action." Id. More specifically, where the plaintiff is unable to establish the underlying cause of action for fraud, the cause of action for conspiracy to defraud must also fail. *Harrell* v. *20th Century Ins. Co.,* 934 F.2d 203, 208 (9th Cir. 1991); *McLemore* v. *Ford Motor Co.,* 628 So. 2d 548, 550–51 (Ala. 1993); *Ray* v. *Atkins,* 205 Ga. App. 85, 90, 421 S.E.2d 317, cert. denied, 205 Ga. App. 901 (1992).

In this case, the plaintiff alleged and the court found, inter alia, that the defendants had conspired to fraudulently transfer Mary Ann Howell's assets to and between the limited liability companies to frustrate the plaintiff's attempts to collect on its judgment.[5] A party alleging a

[5] The third count of the plaintiff's complaint, alleging conspiracy, incorporated the allegations of the first and second counts, which claimed that Mary Ann Howell and Jon Howell had used Design and Antiquities to "perpetrate a fraud or promote injustice." The third count further alleged that "[i]n furtherance of the conspiracy, from May, 1996 to the present, the defendants

fraudulent transfer or conveyance "bears the burden of proving either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations; or (2) that the conveyance was made with a fraudulent intent in which the grantee participated." (Internal quotation marks omitted.) *Connecticut National Bank* v. *D'Onofrio*, 46 Conn. App. 199, 204, 699 A.2d 237, cert. denied, 243 Conn. 926, 701 A.2d 657 (1997). Further, the elements of fraudulent conveyance, including whether the defendants acted with fraudulent intent, must be proven by a heightened standard of proof, that of "clear, precise and unequivocal evidence." (Internal quotation marks omitted.) *Tyers* v. *Coma*, 214 Conn. 8, 11, 570 A.2d 186 (1990); *Picataggio* v. *Romeo*, 36 Conn. App. 791, 793–94, 654 A.2d 382 (1995).[6]

Reading the plaintiff's complaint together with the applicable legal standards, then, the plaintiff was required to prove (1) that Mary Ann Howell and Jon Howell combined (2) to fraudulently transfer Mary Ann Howell's assets, and (3) that Mary Ann Howell or Jon Howell committed an act of fraud pursuant to the scheme (4) that resulted in damage to the plaintiff. See *Bosak* v. *McDonough*, 192 Ill. App. 3d 799, 803, 549

committed one or more of the following overt acts: a. the defendants, Mary Ann Howell and Jon Howell, formed two limited liability companies and transferred the assets of Mary Ann Howell to and between these companies in an effort to avoid payment of the plaintiff's judgment; and b. the defendant, Mary Ann Howell, operated and devoted substantial time and effort to the businesses known as Mary Ann Howell Interiors, L.L.C., and Antiquities Associates, L.L.C., without remuneration, and the defendants Mary Ann Howell and Jon Howell diverted all profits of the business to the defendant, Jon Howell, in an effort to avoid payment of the plaintiff's judgment." The court's finding of a conspiracy was premised on findings regarding the acts alleged in part a, not those in part b. The court did not find that all profits of the businesses were diverted to Jon Howell.

[6] Unlike the other elements of fraud, damages need only be proven by a preponderance of the evidence. *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 330, 593 A.2d 478 (1991).

N.E.2d 643 (1989); 16 Am. Jur. 2d 287, supra, § 63. Regarding the first and second elements, insofar as the transfer of assets to a newly formed company is not unlawful in and of itself, the plaintiff was required to prove, by clear, precise and unequivocal evidence, that the Howells' intent in agreeing to effect the transfer was fraudulent. Regarding the third element, the plaintiff needed to prove, by clear, precise and unequivocal evidence, that the Howells committed an act of fraud pursuant to their plan. Finally, the plaintiff needed to show damages resulting from the conspiratorial acts.

In its memorandum of decision, the court, in concluding that a conspiracy had been proven, held merely that it "[found] the evidence provided by the plaintiff *credible* with regard to its civil conspiracy claim. It proved that Mary Ann Howell and Jon Howell conspired to shield their assets from the plaintiff and did so by transferring assets to Design and Antiquities, and that the plaintiff was damaged because it was unable to collect upon its judgment." (Emphasis added.) The court made no specific finding as to whether the transfers were made fraudulently so as to meet the second and third elements of the test for conspiracy to defraud. More importantly, to the extent we might consider that finding implicit, there is no indication that the court used anything but the preponderance of the evidence standard in conducting its determination.

In *Tessitore* v. *Tessitore*, 31 Conn. App. 40, 623 A.2d 496 (1993), we reversed that portion of the judgment of the trial court that pertained to the finding that a fraudulent transfer had occurred where the court, in its memorandum of decision, stated only that the transfer at issue was "an *obvious* effort to deprive the plaintiff of any interest in the property." (Emphasis in original; internal quotation marks omitted.) Id., 43 n.4. "[B]ecause we [were] not satisfied that the more exact-

ing, clear and convincing standard [of proof] was used," we concluded that a new trial was necessary. Id., 43.

Similarly, in this case, the court did not explicitly refer to the requisite heightened standard of proof for a finding of fraudulent transfer, nor is it implicit from the wording of the memorandum of decision that the proper standard was employed. Because a finding of fraud in this case was a necessary underpinning to a finding of a civil conspiracy, and because we are not satisfied that the court found by clear, precise and unequivocal evidence that Mary Ann Howell and Jon Howell made fraudulent transfers to and between Design and Antiquities, we reverse the court's judgment as to the finding of a civil conspiracy.

## B

We turn now to the question of whether the court improperly held that Jon Howell, as a result of the court's finding of a conspiracy, was liable to the plaintiff for monetary damages of $163,260 and further, whether the court improperly awarded punitive damages of $21,682. We address the damages issue because it is likely to recur on retrial. See *Burns* v. *Hanson*, 249 Conn. 809, 830, 734 A.2d 964 (1999). We conclude that the damages award improperly held Jon Howell liable for the debt of Mary Ann Howell and that the punitive damages award is not authorized by Connecticut law.

After the court concluded that the plaintiff had proven its civil conspiracy claim, it awarded damages of $163,260 against both Jon Howell and Mary Ann Howell. The court arrived at that figure by adding together the $144,679 of personal funds that Mary Ann Howell had used to capitalize Design and the amounts that Design had paid toward the vehicle titled to Jon Howell. The court also awarded punitive damages of $21,682, representing the plaintiff's attorney's fees.

We reiterate that a civil conspiracy action is in essence an action for damages caused by acts committed pursuant to a formed conspiracy, not an action based on the conspiracy itself. *Cole* v. *Associated Construction Co.*, supra, 141 Conn. 54. "The trial court has broad discretion in determining damages, and we will not overturn its decision unless it is clearly erroneous. *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 68, 717 A.2d 724 (1998). [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Keefe* v. *Norwalk Cove Marina, Inc.*, 57 Conn. App. 601, 609, 749 A.2d 1219, cert. denied, 254 Conn. 903, 755 A.2d 881 (2000). In this case, the defendants challenge the court's legal conclusions as to damages.

The principle that it is unfair to impose unbounded liability on a third party for the debts of another is expressed in the statutory and common law of fraudulent conveyances, both of which impose limits on a plaintiff's ability to recover from a fraudulent transferee for the obligations of a debtor transferor. It is true that a creditor plaintiff in a fraudulent conveyance action may seek as remedies both damages and a setting aside of the wrongful conveyance. *Finance Corp. of New England, Inc.* v. *Scard*, 100 Conn. 712, 718, 124 A. 715 (1924); *Nowsky* v. *Siedlecki*, 83 Conn. 109, 112, 75 A. 135 (1910); *Crepeau* v. *Gronager*, 41 Conn. App. 302, 313–17, 675 A.2d 1361 (1996); see also General Statutes

§ 52-552h.[7] Nonetheless, "[c]ommon law principles do not authorize a general creditor to pursue the transferee in a fraudulent conveyance action for anything other than the specific property transferred or the proceeds thereof. *Austin* v. *Barrows*, 41 Conn. 287, 299 (1874); *Smith* v. *Blake*, 1 Day 258, 262 (1804); see also annot., 11 A.L.R.4th 345; 37 C.J.S. Fraudulent Conveyances § 279; Glenn, Fraudulent Conveyances (Rev. Ed. 1940) § 74." *Crepeau* v. *Gronager*, supra, 314–15; see also General Statutes § 52-552i.[8]

As such, a damages award against a fraudulent transferee generally is appropriate only where the transferee subsequently disposes of the transferred property and retains the proceeds of that disposition. In such a situation, the amount of the damages award against the transferee is limited to the proceeds it retained from the disposition of the transferred property, regardless of the total debt owed the plaintiff by the original transferor. See generally *Crepeau* v. *Gronager*, supra, 41 Conn. App. 302; *Connecticut Savings Bank* v. *Obenauf*, 59 Conn. App. 351, 758 A.2d 363 (2000). "Accordingly, under Connecticut law . . . a successful claim of fraudulent conveyance could not result in a judgment of liability against the transferee, joint and several or otherwise, on the underlying debt obligations owed by the transferor [beyond the value of the property wrongfully transferred or the proceeds thereof]." *Connecticut Savings Bank* v. *Obenauf*, supra, 355.

Thus, the gist of the rule of damages is that a fraudulent transferee is not required to forfeit anything more

[7] The Uniform Fraudulent Transfer Act, General Statutes §§ 52-552a to 52-552l "is largely an adoption and clarification of the standards of the common law [of fraudulent conveyances]." (Internal quotation marks omitted.) *Shawmut Bank* v. *Brooks Development Corp.*, 46 Conn. App. 399, 407, 699 A.2d 283 (1997); see also *Molitor* v. *Molitor*, 184 Conn. 530, 535–36, 440 A.2d 215 (1981).

[8] See footnote 7.

than that which he wrongfully obtained via the fraudulent transfer. In this case, because Design and Antiquities, rather than the alleged conspirator, Jon Howell, are the transferees of Mary Ann Howell's assets, the judgment of damages against Jon Howell in the full amount of the assets transferred to the companies is especially inappropriate. It is clear that Jon Howell, through his allegedly conspiratorial acts, never received or retained proceeds from the entire $144,679 that Mary Ann Howell borrowed against her life insurance policies and invested in Design. The effect of the court's award of damages is unfairly to allow recovery for Mary Ann Howell's debts from the assets of Jon Howell in contravention of Connecticut's law of fraudulent transfers.

Furthermore, we previously have held that punitive damages are not available in a fraudulent transfer action, either pursuant to statute or the common law. *Derderian* v. *Derderian*, 3 Conn. App. 522, 529, 490 A.2d 1008, cert. denied, 196 Conn. 810, 811, 495 A.2d 279 (1985). "[A]llowing a plaintiff to characterize a fraudulent transfer claim as a tort of civil conspiracy in order to gain the benefit of a punitive damages award would be 'legal sophistry' that would swallow the established rule that prohibits such damages." *Northern Tankers (Cyprus) Ltd.* v. *Backstrom*, 968 F. Sup. 66, 68 (D. Conn. 1997).

The plaintiff cannot circumvent the damages rules of fraudulent transfer law by casting its claim as one of conspiracy to defraud. "The allegation as to conspiracy brings no strength to the declaration, for it shows no additional cause of action. An act which, done by one alone, is no cause of action, is not rendered actionable by being done in pursuance of a conspiracy. The gist of this action is not the conspiracy, but the damage suffered by the plaintiffs." *Austin* v. *Barrows*, supra, 41 Conn. 300. We conclude that the court's judgment of monetary damages of $163,260 against Jon Howell

and punitive damages of $21,682 was legally and logically incorrect.

## II

The defendants also claim that the court improperly disregarded the corporate forms of Design and Antiquities so as to hold them liable for the personal debt of Mary Ann Howell. We disagree.

"A corporation is a separate legal entity, separate and apart from its stockholders. . . . It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that . . . corporate property is vested in the corporation and *not* in the owner of the corporate stock." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Radzvilowicz*, 47 Conn. App. 1, 18–19, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997). That principle also is applicable to limited liability companies and their members. General Statutes § 34-133. The assets of a corporation or limited liability company, therefore, typically are not available to creditors seeking to recover amounts owed by a stockholder or member of that corporation or limited liability company.[9] Nonetheless, "[c]ourts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed . . . ." (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 552, 447 A.2d 406 (1982).

[9] Pursuant to General Statutes § 34-171, however, a judgment creditor of a limited liability company member may apply to a court to "charge the member's limited liability company interest with payment of the unsatisfied amount of the judgment with interest. . . ." Thereafter, any distributions from the company to the member are available to satisfy the judgment debt. See, e.g., *PB Real Estate, Inc.* v. *DEM II Properties*, 50 Conn. App. 741, 719 A.2d 73 (1998).

The court determined that the facts of this case warranted a disregard of Design's and Antiquities' limited liability structures so as to hold the companies liable for Mary Ann Howell's debt to the plaintiff. The court found sufficient evidence to pierce the corporate veils[10] under both the instrumentality rule; see id., 553; and the identity rule.[11] See id., 554. We will address in turn the court's application of each of these rules, mindful that both involve fact based determinations and that the ultimate "issue of whether the corporate veil [should be] pierced presents a question of fact"; id., 561; *Davenport* v. *Quinn*, 53 Conn. App. 282, 302, 730 A.2d 1184 (1999); such that we must defer to the court's findings unless they are clearly erroneous. See *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).[12]

---

[10] A court's disregard of an entity's structure is commonly known as " 'piercing the corporate veil.' " 18 Am. Jur. 2d 841, Corporations § 43 (1985).

[11] Pursuant to Connecticut case law, however, a court may properly disregard a corporate entity if the elements of *either* the instrumentality rule or identity rule are satisfied. *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 553; *Saphir* v. *Neustadt*, 177 Conn. 191, 209–10, 413 A.2d 843 (1979), *Zaist* v. *Olson*, 154 Conn. 563, 578, 227 A.2d 552 (1967).

[12] The defendants, citing a case from a Louisiana court; *Grayson* v. *R.B. Ammon & Associates, Inc.*, 778 So. 2d 1, 14 (La. App. 2000), writ. denied, 782 A.2d 1026, 1027 (2001), argue that the elements of the instrumentality and identity rules must be proven by a heightened standard, that of clear and convincing evidence. They do not cite, however, to a Connecticut case that so holds nor does our research uncover any. Connecticut cases applying the rules do not indicate that a special burden of proof is applicable and under those circumstances, we may assume that the fair preponderance of the evidence standard has been applied. See *State* v. *Davis*, 229 Conn. 285, 302, 641 A.2d 370 (1994). Further, Associate Justice David M. Borden, dissenting in *Angelo Tomasso, Inc.*, refers to the applicability of the preponderance of the evidence standard to the instrumentality and identity rules; *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 562 (*Borden, J.*, dissenting); and a number of courts have explicitly so held. See, e.g., *Federal Deposit Ins. Corp.* v. *United States*, 654 F. Sup. 794, 809 (N.D. Ga. 1986); *J.L. Brock Builders, Inc.* v. *Dahlbeck*, 223 Neb. 493, 498, 391 N.W.2d 110 (1986); *Wyatt* v. *Bowers*, 103 Nev. 593, 597, 747 P.2d 881 (1987); *North Arlington Medical Building, Inc.* v. *Sanchez Construction Co.*, 86 Nev. 515, 522, 471 P.2d 240 (1970). We conclude that the

We note at the outset that this case presents a fact pattern that, while not especially novel or uncommon, has not been considered by Connecticut's appellate courts. In the usual veil piercing case, a court is asked to disregard a corporate entity so as to make available the personal assets of its owners to satisfy a liability of the entity. In this case, an instance of what is known as "reverse piercing," the plaintiff argues the opposite, that the assets of the corporate entities should be made available to pay the personal debts of an owner.[13]

A number of state and federal courts have employed reverse piercing, recognizing the remedy as appropriate under certain circumstances to prevent fraud or to achieve equity. For example, in *New York* v. *Easton*, 169 Misc. 2d 282, 647 N.Y.S.2d 904 (1995), the court employed reverse piercing to hold two corporations liable for a medicaid fraud judgment that the state had obtained against their president, who had used his control over the corporations to perpetrate the fraud and to conceal and launder the proceeds thus derived. The court considered reverse piercing "not inconsistent with nor antithetical to the salutary purposes of traditional piercing"; id., 289; and held that the direction of the piercing was immaterial where the general tests supporting it had been met. Id., 290.

Many of the reverse pierce cases that our research has disclosed involve similar circumstances, that is, a creditor of an individual debtor is seeking to reach the assets of an entity controlled by that debtor. See, e.g.,

proper standard applicable to the identity and instrumentality rules is the preponderance of the evidence standard.

[13] The fact pattern before us has been more specifically described as "outsider reverse piercing," in that an outside third party pursuing a claim against a corporate insider is attempting to have the corporate entity disregarded. Conversely, in an "insider reverse piercing" claim, a corporate insider attempts to have the corporate entity disregarded. G. Crespi, "The Reverse Pierce Doctrine: Applying Appropriate Standards," 16 J. Corp. L. 33, 37 (1990).

*Goya Foods, Inc.* v. *Unanue-Casal*, 982 F. Sup. 103 (D. Puerto Rico 1997), aff'd, 233 F.3d 38 (1st Cir. 2000), cert. denied, 532 U.S. 1022, 121 S. Ct. 1964, 149 L. Ed. 2d 758 (2001); *Shamrock Oil & Gas Co.* v. *Ethridge*, 159 F. Sup. 693 (D. Colo. 1958); *Minich* v. *Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979); *Central National Bank & Trust Co. of Des Moines* v. *Wagener*, 183 N.W.2d 678 (Iowa 1971).

Nonetheless, use of the doctrine has arisen in varied additional contexts. See, e.g., *FMC Finance Corp.* v. *Murphree*, 632 F.2d 413 (5th Cir. 1980) (defendant in action brought by subsidiary corporation allowed to assert defense based on actions of subsidiary's parent corporation); *Allied Chemical Corp.* v. *Randall*, 321 F.2d 320 (7th Cir. 1963) (individual controlled two corporations, used control to divert assets from debtor corporation; corporate structures disregarded such that individual, both corporations liable for debt); *Estudios, Proyectos E Inversiones De Centro America, S.A.* v. *Swiss Bank Corp.*, 507 So. 2d 1119 (Fla. App.) (allowing reverse piercing claim in context of prejudgment attachment), review denied, 518 So. 2d 1274 (Fla. 1987).

State courts have used reverse piercing in family law cases; see, e.g., *Zisblatt* v. *Zisblatt*, 693 S.W.2d 944 (Tex. App. 1985) (allowing wife to assert reverse piercing claim to attach assets of corporation partially owned by husband in controversy over whether assets were divisible community property); *W.G. Platts, Inc.* v. *Platts*, 49 Wash. 2d 203, 298 P.2d 1107 (1956) (upholding lien attached in favor of wife on property owned by husband's "alter ego" corporation); and federal courts also have employed the theory to permit the United States to recover a delinquent taxpayer's liability from an alter ego business entity. See, e.g., *Towe Antique Ford Foundation* v. *Internal Revenue Service*, 999 F.2d 1387, 1390 (9th Cir. 1993); *Shades Ridge Holding Co.* v. *United States*, 888 F.2d 725, 728 (11th Cir. 1989), cert.

denied sub nom. *Fiorella* v. *United States*, 494 U.S. 1027, 110 S. Ct. 1472, 108 L. Ed. 2d 609 (1990); *Valley Finance, Inc.* v. *United States*, 629 F.2d 162, 171–72 (D.C. Cir. 1980), cert. denied sub nom. *Pacific Development, Inc.* v. *United States*, 451 U.S. 1018, 101 S. Ct. 3007, 69 L. Ed. 2d 389 (1981). We discern from these cases a growing recognition of the doctrine of reverse piercing of the corporate veil.

A guiding concept behind both standard and reverse veil piercing cases is the need for the court to "avoid an over-rigid preoccupation with questions of structure . . . and apply the preexisting and overarching principle that liability is imposed to reach an equitable result." (Citations omitted; internal quotation marks omitted.) *LiButti* v. *United States*, 107 F.3d 110, 119 (2d Cir. 1997). We consider this directive to be sensible and therefore recognize that under the appropriate circumstances, i.e., when the elements of the identity or instrumentality rule have been established, a reverse pierce is a viable remedy that a court may employ when necessary to achieve an equitable result and when unfair prejudice will not result.[14]

---

[14] A concern of courts that have rejected reverse piercing is that corporate shareholders, other than the insider against whom the outsider is asserting its primary claim, may be unfairly prejudiced when assets in which they have an interest are attached by the outsider to satisfy its claim against the wrongdoing insider. See, e.g., *Cascade Energy & Metals Corp.* v. *Banks*, 896 F.2d 1557, 1577 (10th Cir.), cert. denied sub nom. *Weston* v. *Banks*, 498 U.S. 849, 111 S. Ct. 138, 112 L. Ed. 2d 105 (1990). Although that concern is well placed, it is not implicated by the facts of this case. Design and Antiquities were funded almost entirely with the assets of the insider wrongdoer, Mary Ann Howell. The other members contributed a total of only $30 and took no part in the running of the limited liability companies. Another concern in reverse piercing cases is that they result in the bypass of normal judgment collection procedures, for example the charging of a member's interest in the limited liability company pursuant to General Statutes § 34-171. See *Cascade Energy & Metals Corp.* v. *Banks*, supra, 1577; footnote 9. In this case, however, Mary Ann Howell did not receive regular distributions but rather, paid her personal bills directly using limited liability company funds. Any attempt by the plaintiff to attach distributions, therefore, would have been fruitless.

We now review the court's application of the veil piercing rules to the facts of this case. "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) *Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;* (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; *and* (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Emphasis in original; internal quotation marks omitted.) *Davenport* v. *Quinn,* supra, 53 Conn. App. 300, quoting *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.,* supra, 187 Conn. 553.

We first consider whether the element of domination and control is present under the facts of this case. Specifically, we inquire as to whether the court properly found that Mary Ann Howell dominated and controlled Design directly, and that through extension of her control of Design, she also controlled Antiquities. Courts, in assessing whether an entity is dominated or controlled, have looked for the presence of a number of factors. Those include: "(1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of

debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Hale Propeller, LLC* v. *Ryan Marine Products Pty., Ltd.*, 98 F. Sup. 2d 260, 265 (D. Conn. 2000), citing *William Passalacqua Builders, Inc.* v. *Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991); see also *Northern Tankers (Cyprus) Ltd.* v. *Backstrom*, 967 F. Sup. 1391, 1401–1408 (D. Conn. 1997).

In this case, there is evidence of Mary Ann Howell's dominance and control to satisfy many of those elements. Regarding the third factor, the parties stipulated that Mary Ann Howell used company funds to pay in excess of $30,000 in personal expenses, to purchase gifts for and make interest free loans to family members and to pay the $8247 balance of a loan for a vehicle titled to Jon Howell. As to the fourth factor, the overlap in ownership between Design and Antiquities was nearly complete, in that Mary Ann Howell owned 97 percent of Design and together, Design and Mary Ann Howell owned the entirety of Antiquities. Further, Mary Ann Howell is the general manager of both companies, each of which has no employees but retains the same independent contractors. Design and Antiquities both operate out of the same office space, i.e., the loft over the Howells' garage, thereby satisfying the fifth factor. Regarding the seventh, eighth and tenth factors, Design's retention of revenue obtained through the sale of Antiquities' inventory evidences a lack of arm's length dealing between the two companies, a failure to treat Antiquities as an independent profit center and Design's treatment of Antiquities property as if it belonged to Design. Given the evidence, we cannot say that it was clearly erroneous for the court to have found that Mary Ann Howell exercised domination and control over Design and Antiquities.

We next consider whether the court properly found that Mary Ann Howell used that control and dominance to perpetrate a wrong. In 1995, the plaintiff initiated an action against Mary Ann Howell and Interiors, the corporation through which she previously had conducted business and, eventually, obtained a judgment of $657,270. Mary Ann Howell testified that in May, 1996, she formed Design using $144,659 of her own funds[15] along with $30 of her family's funds.[16] Mary Ann Howell testified that Jon Howell had no involvement in Design, other than to sign the paperwork for its formation, and that her daughters were made members of the company only in case anything ever happened to her. She stated that her daughters knew that she made whatever decisions were necessary to run the business, and that they never came to her and suggested that things be done any differently. Mary Ann Howell also testified that she was the only party with signatory powers on Design's bank account.

Some eighteen months later, in November, 1997, after the plaintiff had obtained its judgment in Texas and just before that judgment was recognized by the Connecticut court, Mary Ann Howell, as general manager and 97 percent owner of Design, caused Design to fund the start-up of Antiquities with $102,901 of the money she previously had transferred to Design. Jon Howell, Marla Howell and Wendi Howell had no involvement in the operation of Antiquities.

After the formation of the two limited liability companies, Mary Ann Howell continued to utilize the transferred funds as if they were her own, as evidenced by the stipulations regarding the payment of her personal

---

[15] Mary Ann Howell borrowed the funds by calling her insurance company's 800 number.

[16] According to Mary Ann Howell, sometime prior to the formation of Design, the corporation against which the plaintiff also had obtained its judgment, Interiors, "[j]ust dissolved."

expenses. Moreover, by having Design pay her expenses directly, instead of paying her a salary or providing regular cash distributions, Mary Ann Howell deprived the plaintiff of any means of collecting the judgment against her. See *Davenport* v. *Quinn*, supra, 53 Conn. App. 302; see also footnote 9. Given the evidence before it, the court properly found that Mary Ann Howell had used her control of Design and Antiquities unjustly to avoid her personal debt to the plaintiff.[17]

Last, we review the court's finding that Mary Ann Howell's transfer of her personal funds to Design, and then to Antiquities, proximately caused the loss of which the plaintiff complained. In *United Electrical Contractors, Inc.* v. *Progress Builders, Inc.*, 26 Conn. App. 749, 603 A.2d 1190 (1992), this court concluded that a defendant's transfer of real property to his wife from a corporation that he controlled proximately caused the plaintiff's injury sufficiently to pierce the corporate veil. In that case, the plaintiff was owed money for services it performed on the real property under a contract with another corporation controlled by the defendant. The plaintiff claimed that the transfer "prevent[ed] [the property] from being taken by legal process and . . . prevent[ed] [the plaintiff] from securing payment of its indebtedness." (Internal quotation marks omitted.) Id., 753 n.2; see also *Davenport* v. *Quinn*, supra, 53 Conn. App. 302–303.

---

[17] We reject the defendants' assertion that the plaintiff was required to prove the elements of fraud for the second element of the rule to be satisfied. "The instrumentality rule merely requires the trial court to find that the defendants committed an unjust act in contravention of the plaintiff's legal rights." *Toshiba America Medical Systems, Inc.* v. *Mobile Medical Systems, Inc.*, 53 Conn. App. 484, 491, 730 A.2d 1219, cert. denied, 249 Conn. 930, 733 A.2d 851 (1999). It is not necessary to prove actual fraud. *DeWitt Truck Brokers, Inc.* v. *W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir. 1976); *Krivo Industrial Supply Co.* v. *National Distillers & Chemical Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973); see also *DeMartino* v. *Monroe Little League, Inc.*, 192 Conn. 271, 275, 471 A.2d 638 (1984) (unnecessary to show fraud where one corporation used as adjunct to another).

In this case, Mary Ann Howell, with knowledge that the plaintiff was pursuing a claim against her that she chose not to defend, transferred the cash value of her life insurance policies from herself to Design. That transfer prevented the plaintiff from securing collection of the judgment it eventually obtained against Mary Ann Howell. We conclude that the proximate causation requirement similarly is satisfied here. As such, the court was correct in finding that the elements of the instrumentality rule were satisfied. We turn now to its application of the identity rule.

"The identity rule has been stated as follows: If a plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.) *Davenport* v. *Quinn*, supra, 53 Conn. App. 300–301, quoting *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 554. "The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 560. "There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." (Internal quotation marks omitted.) Id., 556; see also *Klopp* v. *Thermal-Sash, Inc.*, 13 Conn. App. 87, 89 n.3, 534 A.2d 907 (1987)

(identity doctrine primarily applied to reach beyond veil to another corporation).

In applying the identity rule, the court found that there was unity of interest between Mary Ann Howell and the two limited liability companies. It considered her large ownership interests in both Design and Antiquities and, more importantly, how she used her complete control of each company to manage their assets as if they were her own. The evidence presented at trial showed that Mary Ann Howell used company funds extensively to pay personal expenses, to make casual loans[18] to family members and to buy gifts for family members, and that Mary Ann Howell conducted the operations of Design and Antiquities without any input from the other members. Although Design paid significant amounts toward the cost of a vehicle, that vehicle was titled to Jon Howell.

Little was presented to demonstrate the adherence to any corporate formalities other than some segregation of expenses for tax purposes.[19] Mary Ann Howell used the same checking account and credit cards for both personal and business purposes, although the bills were paid entirely by the limited liability companies. Mary Ann Howell testified that items purchased by one company sometimes were paid for by the other and that she was unsure whether corresponding reimbursements were effected. Regular distributions were not made to members, nor were meetings held. Neither company leased office space, but operated out of the same area of the Howells' home. Antiquities was treated

---

[18] In response to a discovery request, Mary Ann Howell did not produce any promissory note documenting a $5000 loan from Design to her daughter, Wendi Howell. No interest was charged on that loan.

[19] Nonetheless, Mary Ann Howell did not prepare 1998 or 1999 tax returns for herself, Design or Antiquities until approximately one month before the May, 2000 trial and was unsure whether those tax returns had been submitted to the Internal Revenue Service.

as an adjunct of Design, not as an independent entity with its own distinct interests. Given the evidence, it was not clearly erroneous for the court to have found that Mary Ann Howell conducted the business of the two companies no differently from the way she conducted her personal affairs and, thus, the identity rule was satisfied.

We recognize that the separate existence of a corporate entity for liability purposes represents a public policy choice, as expressed in Connecticut's legislation governing the formulation and regulation of corporations and limited liability companies, and that the corporate or limited liability form should not be disregarded lightly. *Toshiba America Medical Systems, Inc.* v. *Mobile Medical Systems, Inc.*, 53 Conn. App. 484, 489, 730 A.2d 1219, cert. denied, 249 Conn. 930, 733 A.2d 851 (1999). We note additionally that of the many factors underlying a finding that the instrumentality or identity rule has been satisfied, no one factor or group of factors is necessarily dispositive of the inquiry. However, "[w]hen the statutory privilege of doing business in the corporate [or limited liability company] form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation [or limited liability company] will be disregarded." (Internal quotation marks omitted.) Id., 492. We therefore conclude that the court properly disregarded Design's and Antiquities' structures as limited liability companies so as to hold them liable for the personal debt of Mary Ann Howell.[20]

---

[20] The defendants make two other claims that we need address only briefly. They argue that pursuant to state statutes, some of the cash value of Mary Ann Howell's life insurance policies would not have been available for attachment had she not borrowed it and invested it in the limited liability companies and, therefore, the court improperly found damages in the full amount that was transferred. Presumably, the defendants' position is that the monetary exemption under General Statutes § 52-352b (s) survives when

The judgment awarding monetary and punitive damages based on conspiracy is reversed and the case is remanded for a new trial on that issue. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

the policyholder borrows and invests the cash value. Because the defendants provide no analysis or authority in support of their claim, however, we decline to afford it review. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Citation omitted; internal quotation marks omitted.) *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 840, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001).

The defendants also argue that the court improperly relied on evidence outside the record when it found that Mary Ann Howell exceeded her management authority by making loans that were not at arm's length to relatives and that she "made sure" that the other members did not have significant ownership interests in the limited liability companies. The companies' operating agreements, which were admitted into evidence at trial, did not give the general manager the power to make loans to nonmembers or to make loans to members on terms that were not at arm's length. Section 2.4 (b) of each operating agreement states in relevant part that "[n]o assets of the Company shall be transferred or encumbered or used in payment of any individual obligation of a Member." Section 5.1 of each agreement, governing distributions, required that they be approved by unanimous vote of the members. Id. Mary Ann Howell's brother was not a member of either company and there was no evidence that the members authorized a distribution to Mary Ann Howell for her brother's expenses. Furthermore, it was established that Jon Howell, Marla Howell and Wendi Howell each possessed only a 1 percent interest in Design and no interest in Antiquities, and did not participate in the operations of either company. We note that "[i]t is within the province of the trial court to find facts and draw proper inferences from the evidence presented." (Internal quotation marks omitted.) *Azia* v. *DiLascia*, 64 Conn. App. 540, 558, 780 A.2d 992, cert. denied, 258 Conn. 914, 782 A.2d 1241 (2001). From the evidence presented, the court properly inferred as it did when it found that Mary Ann Howell "made sure" the other members did not have significant interests in the companies.