37 A.3d 724 (2012)
304 Conn. 128
COMMISSIONER OF ENVIRONMENTAL PROTECTION et al.
v.
STATE FIVE INDUSTRIAL PARK, INC., et al.
No. 18543.
Supreme Court of Connecticut.
Argued September 6, 2011.
Decided March 20, 2012.
*727 Kerry M. Wisser, West Hartford, with whom was Nathan A. Schatz, for the appellants (defendants).
Krista E. Trousdale, assistant attorney general, with whom were Matthew I. Levine, assistant attorney general, Susan Gruen, corporation counsel, and, on the brief, Richard Blumenthal, former attorney general, and for the appellees (plaintiffs).
ROGERS, C.J., and NORCOTT, PALMER, ZARELLA, McLACHLAN and EVELEIGH, Js.
ROGERS, C.J.
This case raises the question of whether the equitable doctrine of reverse piercing of the corporate veil is a viable remedy in Connecticut. The defendants, State Five Industrial Park, Inc. (State Five), and Jean L. Farricielli (Jean), appeal[1] from the judgment of the trial court holding them liable, after invoking both reverse and traditional veil piercing principles, for a $3.8 million judgment rendered in 2001 (2001 judgment)[2] against Jean's husband, Joseph J. Farricielli (Joseph), and five corporations that he owned and/or controlled, in an environmental enforcement action (1999 action) brought by the plaintiffs, the commissioner of environmental protection (commissioner), the town of Hamden (town) and the town's zoning enforcement officer.[3] See generally Rocque v. Farricielli, 269 Conn. 187, 848 A.2d 1206 (2004). The defendants claim that the trial court improperly employed reverse veil piercing to hold them liable for the 2001 judgment because that remedy should not be recognized at all in Connecticut or, alternatively, that the trial court should not have applied it given the facts of the present case. We agree that the *728 facts that were proven in this case do not warrant reverse veil piercing and, accordingly, reverse the judgment.[4]
The following facts, which the trial court found, and procedural history are relevant to the appeal. On July 9, 1999, the commissioner initiated an action against Joseph and the five corporations that he controlled and/ or ownedHamden Salvage, Inc., Tire Salvage, Inc., North Haven Tire Disposal, Inc., Quinnipiak Real Estate & Development Corporation and Hamden Sand & Stone, Inc.alleging egregious violations of state statutes regulating solid waste disposal. Id., at 191, 848 A.2d 1206. "Specifically, the commissioner sought: an order from the trial court enforcing the terms of the commissioner's 1998 consent order with [Joseph] and his corporations, which was designed to end ongoing statutory violations; a temporary and permanent injunction requiring [Joseph] and his corporations to cease their illegal activities; and an order requiring [Joseph] and his corporations to pay civil penalties for each day of each alleged violation.... [T]he plaintiffs filed a joint amended complaint seeking, in addition to all of the aforementioned remedies, enforcement of an existing cease and desist order and the stipulated judgment in effect between the town and [Joseph] and his corporations, which was designed to end ongoing violations of various zoning ordinances. A bench trial took place in September and October, 2000, and the trial court issued its memorandum of decision on September 21, 2001, ordering all of the forms of relief sought by the plaintiffs." Id., at 191-92, 848 A.2d 1206. Joseph appealed and, on June 1, 2004, this court affirmed the trial court's judgment.[5] Id., at 213, 848 A.2d 1206.
The 2001 judgment required Joseph and his corporations to, inter alia, post bonds, fund the closure of two illegal solid waste landfills and pay approximately $3.8 million in civil penalties to the commissioner and the town. The judgment also required Joseph and his corporations to reimburse the commissioner for amounts expended in addressing environmental conditions at the landfills. Although the bonds have been posted, in part, and substantial remediation work has been done at the subject properties since the 2001 judgment, the civil penalties largely have gone unpaid.
In 2005, the plaintiffs initiated the present action, alleging that Jean and *729 State Five should be held liable for all of the obligations imposed upon Joseph and his corporations pursuant to the 2001 judgment. Specifically, they alleged that reverse veil piercing should apply to hold State Five liable for the 2001 judgment against Joseph and that traditional veil piercing thereafter should apply to hold Jean liable for the resulting judgment against State Five. As to each veil piercing claim, the plaintiffs alleged that both the instrumentality and identity rules had been satisfied.
A trial to the court was held in February and March, 2008. The trial court examined the activities of Joseph, Jean and State Five prior and subsequent to the 2001 judgment and found the following facts. State Five, under its present name and various others, has been in existence since 1967.[6] State Five's most substantial asset is a piece of land in Hamden known as parcel C.[7] State Five primarily is engaged in leasing out portions of parcel C to commercial tenants, for which it collects rents. Parcel C also houses a cellular telephone tower, for which State Five has received rental income. On October 14, 1999, during the pendency of the 1999 action, the commissioner attempted to add State Five as a defendant in that action, but its motion was denied.[8]
Over the years, Joseph has quitclaimed real property to State Five, including parcel C in February, 1996. In January, 2000, he caused Tire Salvage, Inc., to transfer a strip of land to State Five so that parcel C would meet the requisite regulatory requirements for construction of the cellular telephone tower. Between 2001 and 2004, Joseph wrote personal checks transferring funds to State Five, and he provided a down payment for a pickup truck for the company.
Joseph presently has no ownership interest in State Five. All of the stock of State Five is owned by another entity, Recycling Enterprises (Recycling). Eighty percent of the stock of Recycling is owned by Jean, and the remaining 20 percent is owned by the two sons of Jean and Joseph, thereby giving the sons an indirect ownership interest in State Five. The sons are not parties to this action. This ownership structure originated in the late 1980s, when Joseph transferred all of the stock of State Five to Recycling, and has been in place since then, except for a period between December, 2001, and August, 2004. During that period, Recycling transferred ownership of all of State Five's stock to a friend of Jean and Joseph, William J. LaVelle.[9] The trial court found that Joseph had negotiated the transfer of stock to LaVelle, that it was not an authentic sale[10] and that Joseph and Jean retained control over State Five during the period of LaVelle's ownership.
*730 Joseph currently is not an officer or director of State Five. Prior to February, 2001, he was president of State Five, but on February 15, 2001, LaVelle assumed that office. Jean is currently president and sole officer and director of State Five. The sons have not been involved in running either State Five or Recycling. According to the trial court, the sons "had no real involvement with [those companies]. They did not make any decisions necessary to run the business and did not make any suggestions that things be done any differently."
Prior to February, 2001, Joseph ran all aspects of State Five. Thereafter, although he held no formal office or position at State Five, he remained very involved in its operations. During the period that LaVelle owned State Five and was its president, LaVelle's control over State Five was restricted, and Joseph and Jean both continued to participate in State Five's affairs. Although it was agreed that LaVelle would split profits that accrued from the development of parcel C with Joseph and Jean, LaVelle ran into roadblocks when pursuing that development, and no significant progress was made. Jean frequently was present at State Five's offices and dealt with its tenants. Joseph maintained an office at State Five, sometimes received wages from the corporation and continued to deal with its tenants. He directed its bookkeeper and accountant as to how to characterize transactions, and he wrote correspondence on State Five's behalf. Both Joseph and Jean continued to write checks from State Five's checking account.
Subsequent to the 2001 judgment, State Five continued to earn rental income from its existing tenants, and it gained several new tenants during LaVelle's tenure. While State Five previously had operated profitably as a landlord and, between 1998 and 2000, was not liable on any notes to lending institutions, it began, starting in 2001, to take on substantial debt by assuming obligations of Hamden Sand & Stone, Inc., without also acquiring that corporation's assets. The corporate debt that State Five assumed had been personally guaranteed by Jean and Joseph. Between 2001 and 2006, State Five's financial condition worsened, it became thinly capitalized and most of its debt did not relate to its business as a landlord.
To keep State Five viable, Jean contributed her own funds, as well as those borrowed from her mother, to finance State Five. Additionally, she borrowed against her own property, and property she owned jointly with Joseph, and put the proceeds into State Five. State Five also opened a line of credit with Citizens Bank, which was secured with Jean's personal assets.
Despite its poor financial condition, State Five paid "thousands of dollars" worth of personal expenses for Jean and Joseph, consisting mostly of joint obligations, but also including individual expenses such as Joseph's legal expenses. State Five's accounting treatment of these personal expenses was improper and inconsistent, and it lacked appropriate documentation. Although Joseph and Jean have caused State Five to make payments to themselves or loans to family members, they have not caused State Five to make any payments due under the 2001 judgment.
After comprehensively surveying Connecticut's jurisprudence addressing traditional veil piercing claims, as well as Litchfield Asset Management Corp. v. Howell, 70 Conn.App. 133, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002), which is the only Connecticut appellate decision explicitly approving a reverse veil piercing claim, the trial court applied the legal standards set forth in those cases, namely, the identity and instrumentality *731 rules,[11] to hold State Five liable for the entire 2001 judgment against Joseph. The court thereafter applied the same rules and held Jean liable for the resulting judgment against State Five.
The trial court considered, but rejected, the defendants' argument that reverse veil piercing should not apply because the plaintiffs had adequate remedies at law that they had not pursued, including, inter alia, filing a fraudulent transfer action. The court concluded, however, that reverse veil piercing nevertheless was warranted because the parties, following the 2001 judgment, "were occupied with the appeal and remediation efforts," and because Jean and Joseph made unspecified misrepresentations in postjudgment interrogatories,[12] "attempted to use State Five to hide assets" and used State Five "funds to pay thousands of dollars in personal expenses, complicating any normal collection efforts." This appeal followed.
The defendants claim that the trial court improperly held State Five liable for the 2001 judgment against Joseph because this court has never recognized reverse veil piercing and argue that, for various policy reasons, it should not be adopted as a viable legal theory in Connecticut under any circumstances. Consequently, they request that Litchfield Asset Management Corp. v. Howell, supra, 70 Conn.App. at 133, 799 A.2d 298, a case in which the Appellate Court applied reverse veil piercing to hold a corporate defendant liable for a stockholder's debt, be overruled. Alternatively, the defendants argue that reverse veil piercing is not proper on the facts of the present case. Because we agree that the facts proven here do not support the application of reverse veil piercing as that doctrine has been applied in other jurisdictions, we need not answer the question of whether the doctrine should be disallowed in Connecticut under any and all circumstances.[13]
*732 We begin with the applicable standard of review. "Whether the circumstances of a particular case justify the piercing of the corporate veil presents a question of fact." (Internal quotation marks omitted.) Naples v. Keystone Building & Development Corp., 295 Conn. 214, 234, 990 A.2d 326 (2010). Accordingly, we defer to the trial court's decision to pierce the corporate veil, as well as any subsidiary factual findings, unless they are clearly erroneous. Id. "A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) Levine v. Sterling, 300 Conn. 521, 535, 16 A.3d 664 (2011).
"Generally, a corporation is a distinct legal entity and the stockholders are not personally liable for the acts and obligations of the corporation"; Saphir v. Neustadt, 177 Conn. 191, 209, 413 A.2d 843 (1979); or vice versa. "Courts will, however, disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor." Id.
In a traditional veil piercing case, a litigant "requests that a court disregard the existence of a corporate entity so that the litigant can reach the assets of a corporate insider, usually a majority shareholder. In a reverse piercing action, however, the claimant seeks to reach the assets of a corporation or some other business entity... to satisfy claims or a judgment obtained against a corporate insider." C.F. Trust, Inc. v. First Flight, L.P., 266 Va. 3, 10, 580 S.E.2d 806 (2003); see also In re Blatstein, 192 F.3d 88, 100 (3d Cir.1999); Postal Instant Press, Inc. v. Kaswa Corp., 162 Cal.App.4th 1510, 1513, 77 Cal.Rptr.3d 96 (2008), cert. denied, 2008 Cal. LEXIS 10671 (August 27,2008); annot., 2 A.L.R.6th 195, § 2 (2005). In either circumstance, veil piercing is not lightly imposed. "[C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities." Cascade Energy & Metals Corp. v. Banks, 896 F.2d 1557, 1576 (10th Cir.), cert. denied sub nom. Weston v. Banks, 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990). Accordingly, "the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (Internal quotation marks omitted.) Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 187 Conn. 544, 557, 447 A.2d 406 (1982).
Although some courts have adopted reverse veil piercing with little distinction as a logical corollary of traditional veil piercing, because the two share the same equitable goals, others wisely have recognized *733 important differences between them and have either limited, or disallowed entirely, reverse veil piercing. See G.S. Crespi, "The Reverse Pierce Doctrine: Applying Appropriate Standards," 16 J. Corp. L. 33, 37 (1990) ("reverse pierce claims implicate different policies and require a different analytical framework from the more routine corporate creditor veil-piercing attempts"). Three specific concerns have been identified. "First, reverse piercing bypasses normal judgment-collection procedures, whereby judgment creditors [of an individual judgment debtor] attach the judgment debtor's shares in the corporation and not the corporation's assets." (Internal quotation marks omitted.) Postal Instant Press, Inc. v. Kaswa Corp., supra, 162 Cal.App.4th at 1520, 77 Cal. Rptr.3d 96. When corporate assets are attached directly for the benefit of the creditors of an individual, it prejudices rightful creditors of the corporation, who relied on the entity's separate corporate existence when extending it credit and "underst[ood] their loans to be secured expressly or otherwiseby corporate assets." Floyd v. Internal Revenue Service, 151 F.3d 1295, 1299 (10th Cir.1998).
Second, if a "corporation has other non-culpable shareholders, they [too] obviously will be prejudiced if the corporation's assets can be attached directly. In contrast, in ordinary piercing cases, only the assets of the particular shareholder [or other insider] who is determined to be the corporation's alter ego are subject to the attachment." (Internal quotation marks omitted.) Postal Instant Press, Inc. v. Kaswa Corp., supra, 162 Cal.App.4th at 1520, 77 Cal.Rptr.3d 96. Thus, "[a] key factor in any outsider reverse piercing controversy is the presence of corporate shareholders other than the insider against whom the outsider is asserting the primary claim. If other shareholders do exist, allowance of a reverse pierce would prejudice those shareholders by allowing the outsider to attach assets in which they have an interest." G.S. Crespi, supra, 16 J. Corp. L. at 65.[14]
Finally, because corporate veil piercing is an equitable remedy, it should be granted only in the absence of adequate remedies at law. See Naples v. Keystone Building & Development Corp., supra, 295 Conn. at 233, 990 A.2d 326; see also Floyd v. Internal Revenue Service, supra, 151 F.3d at 1300; 1 W. Fletcher, Cyclopedia of the Law of Private Corporations (1999) § 41.25, p. 604; annot., 2 A.L.R.6th, supra, § 3, at p. 195. In the case of a traditional veil pierce, "[w]hen a judgment debtor is a corporation, the judgment creditor cannot reach the assets of the individual shareholders due to limitations on liability imposed by corporate law"; Postal Instant Press, Inc. v. Kaswa Corp., supra, 162 Cal.App.4th at 1522, 77 Cal.Rptr.3d 96; thereby justifying the invocation of equity. Conversely, when the judgment debtor is a shareholder or other insider, many legal remedies potentially are available to reach corporate assets that rightfully should be available for collection, including the attachment of the debtor's shares in the corporation, if he or she is a shareholder, garnishment of his or her pay from the corporation, if he or she *734 is an employee, challenging of his or her transfers of assets to the corporation as fraudulent conveyances or illegal conversion, or attribution of individual conduct to the corporation under theories of agency or respondeat superior. See id., at 1520, 77 Cal.Rptr.3d 96; Floyd v. Internal Revenue Service, supra, at 1300. If pursued, these remedies may "[obviate] the need for the more drastic remedy of corporate disregard." Floyd v. Internal Revenue Service, supra, at 1300; see, e.g., Owens & Sons, Inc. v. Guastella East, Inc., 354 So.2d 571, 572 (La.App.1977) (finding reverse pierce "an unnecessary and therefore unavailable remedy" where judgment creditor could execute on debtors' shares).
When the preceding concerns are implicated, courts have declined to impose reverse veil piercing. To summarize, "a court considering reverse veil piercing must weigh the impact of such action upon innocent investors.... A court considering reverse veil piercing must also consider the impact of such an act upon innocent secured and unsecured creditors. The court must also consider the availability of other remedies the creditor may pursue." C.F. Trust, Inc. v. First Flight, L.P., supra, 266 Va. at 12-13, 580 S.E.2d 806.
We conclude that in the present matter, the trial court should not have applied reverse veil piercing, regardless of whether it is a viable theory in Connecticut. Certain of the trial court's subsidiary factual findings lacked evidentiary support and, therefore, were clearly erroneous. Those findings related to crucial factors that necessarily render reverse veil piercing inequitable. Additionally, after reviewing the trial court's application of the identity and instrumentality rules, although we conclude that the court's findings have some basis in the evidence, we nevertheless are left with the definite and firm conviction that a mistake has been made.
First, the plaintiffs failed to demonstrate[15] that the sons, indirect owners of a 20 percent interest in State Five, were participants in any wrongdoing in relation to State Five's affairs. Moreover, there was no evidence indicating that their ownership interests in State Five somehow were illusory. The sons were not made parties to the present action; see Estate of Daily v. Title Guaranty Escrow Service, 178 B.R. 837, 844 (D.Hawai'i 1995) (refusing to allow reverse piercing claim when debtor's children, to whom debtor allegedly had transferred corporate stock for no consideration, could not be made parties to action and therefore could not defend their legal interests), aff'd, 81 F.3d 167 (9th Cir.1996); nor were they called to testify about their knowledge or activities regarding State Five. No testimony or other evidence was presented that tended to show that the sons were aware of, and acquiesced in, any of the conduct that the trial court found objectionable. Nevertheless, according to the trial court, because the evidence showed that the sons "had no real involvement in" State Five and "did not make any decisions necessary to run the business and did not make any suggestions that things be done any differently," it "did not support a finding that the ... sons were innocent shareholders" whose interests required protection. We do not agree.
Evidence of the sons' lack of involvement in running State Five, making necessary business decisions or suggesting any changes simply does not support the trial court's finding, implicit in the previous statement, that they were complicit in Joseph's *735 activities, which the court relied on to justify a reverse veil pierce. Accordingly, that important finding is clearly erroneous. Reasonably, the circumstances cited by the court suggest only that the sons were passive minority owners of State Five, and nothing more. Compare Sweeney, Cohn, Stahl & Vaccaro v. Kane, 6 App. Div.3d 72, 78-79, 773 N.Y.S.2d 420 (2004) (permitting reverse veil pierce where judgment debtor's husband, co-owner of corporation, "certainly acted in concert with the judgment debtor," "was a driving force behind the scheme to avoid [her] creditors" and, although party to case, never claimed otherwise), appeal dismissed, 3 N.Y.3d 751, 821 N.E.2d 965, 788 N.Y.S.2d 661 (2004). Because the plaintiffs did not establish that the sons were not innocent shareholders, it was improper for the trial court to apply reverse veil piercing without regard to whether their interests would be impacted. Compare LFC Marketing Group, Inc. v. Loomis, 116 Nev. 896, 905-906, 8 P.3d 841 (2000) (upholding reverse pierce where trial court had made specific finding that innocent shareholder would not be harmed by attachment of commissions wrongfully diverted to corporation); Standage v. Standage, 147 Ariz. 473, 476, 711 P.2d 612 (App. 1985) (upholding reverse pierce in dissolution action where husband and wife owned entire corporation and no harm to innocent shareholders would result).
Second, the plaintiffs did not demonstrate that nonparty creditors of State Five would not be harmed by making all of the corporation's assets available to satisfy the 2001 judgment by way of a reverse veil pierce. Testimony and printed statements in evidence at trial indicated that State Five had a line of credit of approximately $200,000 with Citizens Bank that it had actively accessed, at times carrying balances that were close to the limit. The trial court in its memorandum of decision did not address this circumstance but subsequently, in response to the defendants' motion for articulation, pointed to its factual finding that the line of credit was secured with Jean's personal assets, not State Five property. The court further noted that a 2007 accounting ledger of State Five indicated that, earlier in the year, the line of credit had been paid off.
To the extent that the court's observations constitute a finding that no third party corporate creditors would be harmed by reverse veil piercing, that finding is clearly erroneous. It is of no consequence that State Five's line of credit is not secured by corporate assets; a lender in this context extends credit in reasonable reliance on the existence of both a viable borrower in possession of assets and the additional security provided by a secondary obliger. See Floyd v. Internal Revenue Service, supra, 151 F.3d at 1299 (corporate creditors rely on entity's separate existence when extending it credit and "understand their loans to be secured expressly or otherwiseby corporate assets" [emphasis added]); In re Phillips, 139 P.3d 639, 646 (Colo.2006) ("secured and unsecured creditors of the corporation have a cognizable legal interest in corporate assets, upon which they relied in lending money and selling goods and services to the corporation" [emphasis added]). Permitting direct attachment of corporate assets to satisfy an individual insider's debt undermines corporate viability, reasonably relied upon by creditors, with no forewarning. Additionally, even if a brief entry in State Five's records, which the trial court considered to be deficient in many respects, suffices to establish that the line of credit was repaid in early 2007, it is silent as to the outstanding balance, if any, on that line of credit in January, 2009, when the trial court issued its memorandum of decision applying reverse veil piercing. In sum, the court did not, before applying reverse veil piercing, adequately *736 ensure that third party creditors did not exist or, if they did, that they would not be prejudiced by the judgment. See, e.g., Standage v. Standage, supra, 147 Ariz. at 476-77, 711 P.2d 612 (before applying reverse veil piercing, trial court made specific provision for corporate liabilities, including not only tax deficiencies, maintenance costs and potential expenses connected with rental property owned by corporation, but also for unknown liabilities that could arise).
Aside from the foregoing problems, our review of the trial court's application of the rules governing veil piercing convinces us that the court improperly concluded that the equitable remedy was warranted in this case.[16] Pursuant to the instrumentality rule, to justify any veil pierce, it is not enough for the plaintiff merely to prove that the insider debtor exercised complete control over the subject corporation. It further must be shown that the debtor used that control "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the plaintiffs'] legal rights; and ... that the aforesaid control and breach of duty ... proximately cause[d] the injury or unjust loss complained of." (Emphasis in original; internal quotation marks omitted.) Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 187 Conn. at 553, 447 A.2d 406.
Applying that standard to the present case, the trial court reasoned that Joseph exercised his control over State Five[17] wrongfully or unjustly and contrary to the plaintiffs' rights by: negotiating the transfer of State Five to LaVelle; transferring financial resources to State Five; comingling personal funds with corporate funds; diverting State Five assets for personal use; and paying personal expenses as well as the property taxes of one of his corporations, while not satisfying the 2001 judgment. According to the court, "Joseph ... committed an unjust act by using [State Five] to evade satisfying the 2001 judgment."
As to proximate causation, the trial court found that "Joseph ... and [his corporations] have not complied with the 2001 judgment; specifically, they have not funded the closure of the [properties involved in the 1999 action], nor have they paid the assessed penalties. Joseph['s] ... direct or indirect control or influence over State Five was used to avoid funding the obligations under the 2001 judgment, including the obligation to pay the civil penalties assessed. Joseph ... was responsible for transferring assets and funds out of the 2001 judgment [corporations], thereby depriving the plaintiffs of means to collect the 2001 judgment. Joseph ... commingled his personal funds with [State Five] to evade the 2001 judgment.
"The plaintiffs attempted property executions, but they have not been able to satisfy the 2001 judgment. They have been deprived of the means of collecting the 2001 judgment. The actions of Joseph... were a substantial factor in the failure to satisfy the 2001 judgment and were the proximate cause of the plaintiffs' loss. As a result, Joseph ... and [his corporations] have not funded the obligations under the [2001] judgment and have not paid the civil penalties."
*737 The chief problem with this analysis is that it fails to establish with specificity the necessary connection between Joseph's improper actions visvis State Five and the plaintiffs' inability to collect on the 2001 judgment. In short, to justify imposing the entire obligation of the 2001 judgment on State Five, the plaintiffs needed to show that Joseph exercised his control over State Five to divert or secrete assets that otherwise would have been available to satisfy that judgment, namely, assets that belonged to him personally or to his corporations, and, further, that these maneuvers were the proximate cause of the plaintiffs' inability to collect $3.8 million that it otherwise would have been able to recover. Although there was evidence that Joseph, in the years following the 2001 judgment, transferred some assets from himself and his corporations to State Five, the trial court did not calculate the value of those transfers, and the evidence presented would not support a finding that their value came anywhere near to the amount for which the court ultimately held State Five liable.[18] Additionally, although Joseph transferred parcel C to State Five for no consideration, he did so in 1996, more than three years before the institution of the 1999 action and more than five years prior to the 2001 judgment that imposed the fines at issue. Given that circumstance, it cannot be argued that the transfer was contrary to the plaintiffs' legal rights and proximately caused their inability to collect on their judgment.[19]
*738 Finally, to the extent that Joseph caused State Five to use its own assets, or those transferred to State Five by its majority owner, Jean, to pay his personal expenses and the tax bill of one of his corporations, his actions did not offend the plaintiffs' collection rights nor cause them any detriment. Because neither Jean nor State Five were defendants in the 1999 action, and because Joseph has had no ownership interest in State Five since the late 1980s, the assets of Jean and State Five were not subject to the 2001 judgment. Accordingly, use of those assets to pay Joseph's personal expenses, although certainly offensive to State Five's interests, was not contrary to the plaintiffs' rights and was not the proximate cause of their inability to collect the judgment against Joseph.[20] If anything, payment of a judgment debtor's expenses by nonliable third parties enhances a creditor's ability to collect from the judgment debtor, in this case Joseph. See, e.g., In re Blatstein, supra, 192 F.3d at 99-100 (upholding district court's refusal to reverse pierce veil where, inter alia, corporation's payments of insider's expenses "actually benefitted his creditors"); Lifshutz v. Lifshutz, 61 S.W.3d 511, 518 (Tex. App.2001) (reverse veil pierce was inappropriate in dissolution action where husband controlled corporations and used their funds to pay his personal expenses, because those payments "actually enhanced the [marital] community [property] at the expense of the corporations").[21]
Understandably, the trial court was troubled by the fact that State Five, owned by Joseph's family members, had assets that benefited Joseph while the obligations imposed by the 2001 judgment remained outstanding. It is not enough, however, simply to show that a judgment remains unsatisfied; indeed, most veil piercing claims are initiated due to unpaid debts. Sea-Land Services, Inc. v. Pepper Source, 941 F.2d 519, 522-23 (7th Cir. 1991); see also 18 Am.Jur.2d 696, Corporations § 47 (2d Ed. 2004) ("[a] corporate entity may not be disregarded simply because it stands as a bar to a litigant's recovery of property"). There must be some wrong beyond the creditor's inability to collect, which is contrary to the creditor's *739 rights, and that wrong must have proximately caused the inability to collect. See Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 187 Conn. at 558, 447 A.2d 406. Simply put, the segregation of assets within State Five and the control of Joseph and Jean over the family owned corporation, standing alone, cannot constitute the basis for veil piercing. See Cascade Energy & Metals Corp. v. Banks, supra, 896 F.2d at 1578 ("the `injustice' or `inequity' on which a piercing claim is based cannot stem from the mere existence of limited liability, which is a legitimate characteristic of the corporate form").
To summarize, the trial court's application of the equitable remedy of reverse veil piercing was based in part on unsupported factual findings, and additionally, the court employed improper reasoning when analyzing other facts such that we are left with the definite and firm conviction that a mistake has been made. Accordingly, the trial court's determination that reverse veil piercing was warranted must be set aside as clearly erroneous, and judgment on the plaintiffs' veil piercing claims should be rendered in favor of the defendants.
The judgment is reversed and the case is remanded with direction to render judgment for the defendants.
In this opinion NORCOTT, PALMER, McLACHLAN and EVELEIGH, Js., concurred.
ZARELLA, J., concurring.
I agree with the result that the majority reaches but write separately to express my view that Litchfield Asset Management Corp. v. Howell, 70 Conn.App. 133, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002), which applied the doctrine of reverse veil piercing in this state for the first time, should be disavowed. Because the facts of the present case implicate the applicability of the doctrine, and because the defendants[1] expressly have asked this court to overrule Howell, I believe it is appropriate and necessary to address the issue. The majority decides this case by assuming that the doctrine is viable in Connecticut but nevertheless determines that the facts of this case do not fall within that doctrine. Resolution of the larger issue, according to the majority, should be left for another day. Connecticut courts, however, have followed Howell in several decisions and, in doing so, have allowed reverse veil piercing in some cases, including in the prior proceedings in the present case.[2] Notably, the courts following Howell have extended it beyond the scenario presented by that case, in which the *740 Appellate Court allowed a judgment creditor to engage in the reverse veil piercing of a limited liability company in which the debtor held a controlling membership. See id., at 135-36, 158, 799 A.2d 298. In sum, the rule espoused in Howell has been broadly interpreted such that reverse veil piercing is applicable to all corporate entities as well as limited liability companies. It appears, therefore, that the majority's decision to "express no opinion on the continued viability of ... Howell"; footnote 13 of the majority opinion; will effectively sanction the continued application of the reverse veil piercing doctrine in our courts. I believe that this court should avail itself of this opportunity to consider and reject this doctrine. Because I believe that compelling considerations militate against allowing reverse veil piercing, I would overrule Howell to the extent it holds that reverse veil piercing is a viable legal theory in this state.
The majority has summarized and explained the general principles governing both traditional veil piercing and reverse veil piercing, and, therefore, I do not repeat that discussion in any length. Suffice it to say that virtually all jurisdictions accept the doctrine of traditional veil piercing, whereas jurisdictions are split on the propriety of adopting the reverse veil piercing doctrine.[3] Those jurisdictions that reject reverse veil piercing provide *741 several justifications for doing so, but those that adopt the doctrine typically do so with little or no exploration of its potential effects, although they generally cite equitable grounds for doing so. Certainly, at first glance, traditional veil piercing and reverse veil piercing appear to be two sides of the same coin. See In re Phillips, 139 P.3d 639, 645 (Colo.2006); see also In re Moore, 608 F.3d 253, 258 (5th Cir.2010) ("[w]e have previously held that distinction [between traditional and reverse veil piercing] to be one without a difference"). "In traditional veil piercing, the veil shields a shareholder who is abusing the corporate fiction to perpetuate a wrong. In outside reverse piercing, however, the corporate form protects the corporation which, through the acts of a dominant shareholder or other corporate insider, uses the legal fiction to perpetuate a fraud or defeat a rightful claim of an outsider. While traditional [piercing] and outside reverse piercing affect diverse corporate interests, the purposes sought to be achieved are similar.
"Both types of piercing strive to achieve an equitable result.... In traditional piercing, equity requires [that] the veil be pierced to impose liability on a shareholder who has abused the corporate form for his or her own advantage.... Similarly, in outside reverse piercing, an equitable result is achieved by ignoring the corporate fiction to attach liability to the corporation." (Citations omitted.) In re Phillips, supra, 139 P.3d at 645.
Jurisdictions adopting the reverse veil piercing doctrine largely have relied on a perceived fundamental similarity between traditional and reverse piercing. With respect to both types of piercing, courts focus on identifying whether an individual has abused the corporate form by failing to treat the corporation as a distinct legal entity. Accordingly, a court will not allow that individual to rely on the statutory protections limiting the individual's liability. Put differently, if an individual and a corporation are indistinguishable by virtue of the individual's own acts, the corporate veil should be subject to piercing in either direction. Thus, both traditional piercing and reverse piercing attempt to rectify the same inequity, and, therefore, some jurisdictions that permit traditional veil piercing also permit reverse veil piercing.
The flaw with this rationale is that it glosses over critical distinctions between traditional and reverse veil piercing. See Postal Instant Press, Inc. v. Kaswa Corp., 162 Cal.App.4th 1510, 1522, 77 Cal.Rptr.3d 96 (2008) ("[t]raditional alter ego doctrine and reverse piercing, while having similar goals, advance those goals by addressing very different concerns"), review denied, 2008 Cal. LEXIS 10671 (Cal. August 27, 2008). The focus cannot be only on whether an individual has abused the corporate form. Under traditional veil piercing, when an individual is held liable for the actions of the corporation, the corporation itself is not affected by the piercing. In the case of reverse veil piercing, however, the opposite is true. The corporation itself is liableand thus corporate assets are vulnerablefor the wrongdoing of an individual. In more concrete terms, reverse veil piercing allows courts to alter the legislatively created corporate form by allowing a creditor to reach otherwise protected corporate assets. Three separate but related issues specifically illustrate the problem with this result.[4]
*742 First, reverse veil piercing "bypasses normal judgment-collection procedures, whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets." Cascade Energy & Metals Corp. v. Banks, 896 F.2d 1557, 1577 (10th Cir.), cert. denied sub nom. Weston v. Banks, 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990); see also M. Richardson, comment, "The Helter Skelter Application of the Reverse Piercing Doctrine," 79 U. Cin. L.Rev. 1605, 1624 (2011) ("counts raised against the corporation for aiding and abetting or under general agency principals could succeed under similar circumstances to those present in many reverse piercing cases"). "[T]raditional theories of conversion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations [in which] one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the [need] to invent a new theory of liability." Cascade Energy & Metals Corp. v. Banks, supra, at 1577.
The Tenth Circuit Court of Appeals recently explained why creating an additional means of securing a judgment against a corporation would be inappropriate by distinguishing a claim grounded in fraudulent transfer from one grounded in reverse veil piercing: "The difference between finding an entity to be a nominee holding fraudulently conveyed assets and finding an entity to be the debtor's alter ego under [the] reverse veil piercing doctrine may be a subtle one. But it is no less significant for its subtlety. Under [the] reverse veil piercing doctrine, the [creditor] would have needed to show that the [corporations] at issue were not just [the debtor's] nominees with respect to the particular assets in question but his alter ego for all purposes. See Bollore S.A. v. Import Warehouse, Inc., 448 F.3d 317, 325 (5th Cir.2006) (recognizing that courts can reverse pierce a corporation's veil based on a finding of alter ego). As reward for making this more onerous showing, the [creditor] might have seized all the assets in the trusts without regard to their original source. See Oxford Capital Corp. v. United States, 211 F.3d 280, 284 (5th Cir.2000) (Under the alter ego doctrine ... all the assets of an alter ego corporation may be levied [on] to satisfy the tax liabilities of a delinquent taxpayer-shareholder if the separate corporate identity is merely a sham.).... By contrast, a nominee holding a fraudulently conveyed asset may maintain an independent legal identity and lawfully hold other assets of its own. Finding that an entity is a nominee of the debtor only requires a showing that the nominee holds bare or apparent title to a particular asset that actually belongs to the debtor. And it is only the particular assets held in this fashion (not others the nominee may possess in its own right) that the debtor's creditor may reach." (Internal quotation marks omitted.) In re Krause, 637 F.3d 1160, 1165 (10th Cir. 2011); see also Postal Instant Press, Inc. v. Kaswa Corp., supra, 162 Cal.App.4th at 1523, 77 Cal.Rptr.3d 96 ("[c]ounsel for [the creditor] acknowledged ... that [it] did not pursue those [traditional] legal remedies *743 because amending the judgment to add [a reverse veil piercing claim against the corporation] as a judgment debtor was simply more expedient"). Simply put, reverse veil piercing greatly expands the scope of assets that a judgment creditor would normally be able to reach under traditional causes of action.
A second issue arises with respect to what assets can, and should be, reached by a creditor. Reverse veil piercing allows a judgment creditor to reach the assets of a corporation to the detriment of other shareholders and existing creditors. That is, "to the extent that the corporation has other non-culpable shareholders, they obviously will be prejudiced if the corporation's assets can be attached directly. In contrast, in ordinary piercing cases, only the assets of the particular shareholder who is determined to be the corporation's alter ego are subject to attachment." Cascade Energy & Metals Corp. v. Banks, supra, 896 F.2d at 1577. Some jurisdictions that have allowed reverse veil piercing have attempted to eliminate, or at least minimize, this concern by prohibiting reverse veil piercing in situations in which doing so would harm other shareholders, or otherwise would be inequitable. See C.F. Trust, Inc. v. First Flight Ltd. Partnership, 266 Va. 3, 12-13, 580 S.E.2d 806 (2003) ("[A] court considering reverse veil piercing must weigh the impact of such action [on] innocent investors, in this instance, innocent limited partners or innocent general partners. A court considering reverse veil piercing must also consider the impact of such an act [on] innocent secured and unsecured creditors. The court must also consider the availability of other remedies the creditor may pursue."); see also In re Phillips, supra, 139 P.3d at 646 ("A court may reverse pierce the corporate veil and obtain the assets of a corporation for the obligations of a controlling shareholder or other corporate insider only upon a clear showing that [1] the controlling insider and the corporation are alter egos of each other ... [2] justice requires recognizing the substance of the relationship over the form because the corporate fiction is utilized to perpetuate a fraud or defeat a rightful claim ... and [3] an equitable result is achieved by piercing.... Only when a claimant makes a clear showing of each factor may the corporate form be disregarded." [Citations omitted.]).
Another way to minimize this concern may be to restrict veil piercing to single shareholder corporations, for it is difficult to conceive of other circumstances in which reverse piercing would not affect other shareholders. See Postal Instant Press, Inc. v. Kaswa Corp., supra, 162 Cal. App.4th at 1524, 77 Cal.Rptr.3d 96 ("To ameliorate the flaws in outside reverse piercing, courts recognizing the doctrine have imposed qualifications and requirements which, in their totality, essentially eliminate the outside reverse piercing doctrine as a practical matter. Indeed, if all the requirements of outside reverse piercing are met, its application would be unnecessary to protect the judgment creditor."). Moreover, if reverse veil piercing is truly an equitable remedy, and thus only available to a plaintiff if no legal remedy exists, it would appear that the limitations espoused by the Virginia and Colorado Supreme Courts in C.F. Trust, Inc., and In re Phillips, respectively, are superfluous.[5] In any event, it does not address a *744 broader, systemic problem implicated by the doctrine, which I discuss next.
A third concern is that reverse piercing injects uncertainty into the corporate structure in a way that could systemically alter the ability of corporations to obtain loans and investment capital. "[T]he prospect of losing out to an individual shareholder's creditors will unsettle the expectations of corporate creditors who understand their loans to be secured expressly or otherwiseby corporate assets. Corporate creditors are likely to insist on being compensated for the increased risk of default posed by outside reverse-piercing claims, which will reduce the effectiveness of the corporate form as a means of raising credit." Floyd v. Internal Revenue Service, 151 F.3d 1295, 1299 (10th Cir.1998); see also M. Richardson, supra, 79 U. Cin. L.Rev. at 1628 ("If reverse piercing is allowed, there would be no rational way to investigate a business to determine the risk it presents.... There are multiple implications to [reverse piercing as a] collateral attack on the rights of consensual creditors.... If creditors take steps to shield themselves from this increased risk, the result could be a general chilling of the ability of small businesses with few owners to receive financing. At the very least, lenders may begin through altered risk calculations to spread the cost of individual misdeeds across all small businesses.").
In light of the foregoing, I believe that we should overrule Howell and reject the doctrine of reverse veil piercing until the legislature signals otherwise. Reverse veil piercing should be a remedy created by the legislature, and not the courts, because corporate entities are creatures of statute, and, unlike traditional veil piercing, reverse veil piercing alters the corporate attributes established by those statutes. As one court has succinctly stated in rejecting the doctrine, "[a]llowing ... reverse piercing claims would constitute a radical change to the concept of piercing the corporate veil ... and, thus, should be created by the [legislature] and not by [the] [c]ourt." Acree v. McMahan, 276 Ga. 880, 883, 585 S.E.2d 873 (2003).
NOTES
[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199(c) and Practice Book § 65-2.
[2] At the time of trial, the amount outstanding on the 2001 judgment had grown to $4,164,317, and the trial court held the defendants liable for that amount. The court also imposed prejudgment interest of 10 percent, calculated from September 21, 2001, and directed that prohibitory injunctions and orders to reimburse the commissioner for certain remediation costs, which were issued in the 1999 action against Joseph and his corporations, also be binding on the defendants in the present action.
[3] We refer to the town, its zoning enforcement officer and the commissioner collectively as the plaintiffs, and note that they were the plaintiffs in Rocque v. Farricielli, 269 Conn. 187, 848 A.2d 1206 (2004), as well.
[4] After imputing liability for the 2001 judgment through Joseph to State Five, by employing reverse veil piercing, the trial court applied traditional veil piercing principles to impose the resulting liability of State Five on Jean, who owns a controlling interest in State Five. In addition to arguing that the trial court improperly applied reverse veil piercing, Jean claims that the trial court improperly: (1) applied "successive," or "triangular," veil piercing to then hold her liable for the judgment against State Five; and (2) applied traditional veil piercing to hold her liable for the judgment against State Five, because the element of proximate causation was not proven. Furthermore, both defendants claim that the trial court improperly ordered additional unauthorized relief, namely, prejudgment interest and the extension of the injunctive relief and orders from the 2001 judgment to the defendants in the present matter. See footnote 2 of this opinion. Our conclusion that the trial court improperly applied reverse veil piercing renders moot all of the defendants' remaining claims. Specifically, without first imputing Joseph's liability for the 2001 judgment to State Five, there is no liability thereafter to transfer from State Five to Jean. Additionally, all of the other relief ordered by the trial court was dependent on its conclusion that the defendants were liable for the 2001 judgment.
[5] In Rocque, the five corporations were defaulted by the trial court for their failure to appear, and they did not appeal from the judgment rendered against them. At the time of the appeal, all of those corporations were "defunct." Rocque v. Farricielli, supra, 269 Conn. at 190 n. 1, 848 A.2d 1206.
[6] Although the corporation known as State Five was known by another name during earlier time periods, we refer to that entity as State Five throughout this opinion.
[7] Illegal dumping activities on properties other than parcel C were the main focus of the 1999 action.
[8] The basis of the commissioner's motion to add State Five as a party to the 1999 action was that access over parcel C was necessary to reach the properties involved in the 1999 action. There were no allegations that State Five was involved in the activities that were the subject of that action.
[9] LaVelle wanted to develop parcel C further as an industrial park. He wished to create distance between State Five and Joseph due to the latter's legal troubles with the state and the town.
[10] Although LaVelle executed an installment sale agreement and a $2.5 million promissory note in conjunction with the stock transfer, he never made any payments on the note.
[11] "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) [c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of....

"The identity rule has been stated as follows: If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.) Naples v. Keystone Building & Development Corp., 295 Conn. 214, 232, 990 A.2d 326 (2010).
[12] In a subsequent articulation, the trial court elaborated: "Contrary to the evidence at trial, the postjudgment interrogatories responses stated that Joseph ... was not employed by State Five and that State Five was holding no assets of his. Based on these responses, the plaintiffs, rightfully, did not seek any garnishment."
[13] We express no opinion on the continued viability of Litchfield Asset Management Corp. v. Howell, supra, 70 Conn.App. at 133, 799 A.2d 298, other than to note that the factual scenario presented by that case differs substantially from the factual scenario in the present appeal. The circumstances relevant to a veil piercing analysis "necessarily vary according to the facts of the particular case. Therefore, each case in which the issue is raised should be regarded as sui generis, to be decided in accordance with its own underlying facts." (Internal quotation marks omitted.) Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 187 Conn. 544, 556 n. 7, 447 A.2d 406 (1982).

As evidenced by our discussion in this opinion and our particular criticisms of the trial court's analysis, we share the concerns expressed by the concurring justice with regard to the potential unfair effects of applying the reverse veil piercing doctrine. We are not convinced, however, that those concerns cannot be addressed adequately, in the appropriate case, by recognition of the doctrine only when it is proven that it achieves its equitable purpose without harming third parties. Because this so clearly is not such a case, and we are reluctant to presume that there is no possible factual scenario in which reverse veil piercing would be appropriate, we decline to hold that this doctrine is not viable under any circumstance at this juncture.
[14] "Judicial recognition of corporations as separate legal entities is well established and plays an important role in encouraging investment by limiting investor risk exposure." G.S. Crespi, supra, 16 J. Corp. L. at 34. If courts permit reverse veil piercing without regard to whether nonculpable shareholders will be impacted, "the general expectations of investors that their corporations will be free from liability for claims against corporate insiders may be impaired. This impairment of investor expectation ultimately could reduce the usefulness of the corporate form as a vehicle for raising and deploying capital...." Id., at 64.
[15] In veil piercing cases, it is the burden of the party seeking to disregard the corporate form that there is a basis for doing so. See 1 W. Fletcher, supra, § 41.28, at pp. 610-11.
[16] We believe that the defendants' argument with respect to the trial court's application of traditional veil piercing from State Five to Jean applies similarly to the court's application of reverse veil piercing from Joseph to State Five.
[17] We do not take issue with the trial court's finding that Joseph exercised control over State Five.
[18] In a seventy-one page memorandum of decision, the trial court's only specific finding regarding a transfer of assets from Joseph and his corporations to State Five was that, in or around 2000, some topsoil, which later was sold for $20,000, was transferred from Hamden Sand & Stone, Inc., to State Five. More frequently, the court found that the corporations transferred their liabilities to State Five. With regard to a $150,000 debt of Hamden Sand & Stone, Inc., the trial court observed that State Five's "records show that equipment associated with [the] debt never came into the business, nor were the proceeds of any sale of assets reflected in the books."

The trial court found that Joseph "wrote personal checks to State Five," but did not indicate the amounts of those checks. Checks in evidence, written from Joseph to State Five following the 2001 judgment, total $59,500. An additional check from Quinnipiak Real Estate & Development Corporation to State Five, endorsed by Joseph and dated May 28, 2002, is for $7500. The trial court also found that Joseph "wrote a check on the Discover Card [of Jean and Joseph] for a down payment on a ... pickup truck for State Five," but does not specify the amount. A memorandum in evidence indicates that the down payment was $4784.49.
In a July, 2009 articulation responding to the defendants' claim that the plaintiffs had failed to pursue other opportunities for collecting the 2001 judgment, the trial court suggested that $250,000 generated from remediation activities at one of the properties at issue in the 1999 action improperly had been recorded in State Five's books. Assuming that to be the case, the total of all transfers of assets during the relevant period is approximately $342, 000, which is less than 10 percent of the judgment for which the trial court ultimately found State Five liable. Because transfers to State Five totaling only $342,000 could not be the proximate cause of the plaintiffs' failure to collect a judgment that had grown to exceed $4 million, application of a reverse veil pierce to make all of State Five's assets available for collection was not equitable.
[19] Similarly, Joseph's transfer of the strip of land from Tire Salvage, Inc., to State Five for construction of the cellular telephone tower occurred in 2000, subsequent to the institution of the 1999 action but prior to the 2001 judgment. If the plaintiffs could show that the two real estate transfers, despite their timing, were improper maneuvers to avoid payment on a preexisting claim, their remedy was to pursue a fraudulent transfer action under the Uniform Fraudulent Transfer Act, General Statutes § 52-552 et seq., which they did not do. Deeds in evidence showed that the transfers were timely recorded in the land records and, therefore, were a matter of public knowledge. Unlike the trial court, we are not convinced that the plaintiffs' preoccupation with other aspects of this litigation excused this lapse. The foregoing is illustrative of a criticism of reverse veil piercing previously discussed, namely, that it permits a bypass of adequate legal remedies. In this instance, application of the statutory provisions governing fraudulent transfer would have established whether the land transfers, given their timing, were wrongful to the plaintiffs and, if so, would have limited the plaintiffs' recovery to the amount of harm caused.
[20] For the same reason, the temporary transfer of State Five's stock to LaVelle did not harm the plaintiffs. Because Joseph did not own that stock, the plaintiffs could not have attached it to satisfy the 2001 judgment. Its transfer to LaVelle was, therefore, of no consequence, even if Joseph negotiated that transfer.
[21] In addition to finding reverse veil piercing justified under the instrumentality rule, the trial court found it applicable pursuant to the identity rule. That rule requires, in addition to a unity of interest between an insider and his corporation(s), that permitting a corporate defendant to "escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise" through adherence to the concept of its separate existence "would serve only to defeat justice and equity...." (Internal quotation marks omitted.) Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 187 Conn. at 554, 447 A.2d 406. Similar to the instrumentality rule, the identity rule is not satisfied in the present case insofar as it is neither unjust nor inequitable to permit State Five to avoid liability for the multimillion dollar judgment against Joseph and his other corporations when it has received little in the way of assets from those parties and much in the way of liabilities and, further, has been caused to pay other expenses of Joseph for which it is not legally obligated. Again, State Five was not a defendant in the 1999 action, and parcel C was not the focus of the 2001 judgment.
[1] The defendants are State Five Industrial Park, Inc., and Jean L. Farricielli.
[2] The doctrine has been cited in at least seven trial court decisions. Commissioner of Environmental Protection v. State Five Industrial Park, Inc., Superior Court, judicial district of Hartford, Docket No. HHD-CV-05-4105888-S, 2009 WL 104287 (January 5, 2009) (reverse veil piercing is viable legal theory and is applicable to corporations); Cadle Co. v. Zubretsky, Superior Court, judicial district of Hartford, Docket No. CV-04-0832477-S, 2008 WL 441935 (January 30, 2008) (same); Angle v. Angle, Superior Court, judicial district of Stamford-Norwalk, Docket No. FST-FA-04-4000812-S, 2007 WL 1053933 (March 22, 2007) ("Connecticut law clearly recognizes the doctrine of piercing the corporate veil as well as the concept of reverse piercing"); LSE Leasing Corp. v. Greenblatt, Superior Court, judicial district of New London, Docket No. KNL-CV-06-5000878, 2006 WL 3878051 (December 14, 2006) ("[w]hen the elements of piercing the corporate veil have been established, a reverse pierce is a viable remedy that a court may employ [against a corporation] when necessary to achieve an equitable result and when unfair prejudice will not result" [internal quotation marks omitted]); Cadle Co. v. Zubretsky, Superior Court, judicial district of Hartford, Docket No. CV-04-0832477-S, 2006 WL 574178 (February 23, 2006) (same); Ackerman v. Sobol Family Partnership, LLP, Superior Court, judicial district of Hartford, Docket No. CV-03-0826123, 2004 WL 1194067 (May 12, 2004) (recognizing applicability of reverse veil piecing doctrine to limited liability companies but dismissing case in part because pleadings failed to support claim under that doctrine); see also In re Flanagan, 373 B.R. 216, 223 (Bankr.D.Conn.2007) ("`[r]everse piercing' claims have been recognized as viable causes of action in Connecticut").

The impact of the Appellate Court's decision in Howell extends beyond the boundaries of this state. For example, the Virginia Supreme Court relied on the decision when it adopted reverse veil piercing as a viable doctrine in that state. See C.F. Trust, Inc. v. First Flight Ltd. Partnership, 266 Va. 3, 11, 580 S.E.2d 806 (2003); see also C.F. Trust, Inc. v. First Flight Ltd. Partnership, 306 F.3d 126, 141 (4th Cir.2002) (reasoning that "[i]f a Virginia court followed the rationale of [Howell], outsider reverse veil-piercing against the limited partnership would be a viable option ... even if not generally permitted in cases involving limited partnerships"). Scholars and academics also have relied on Howell in their discussions regarding the appropriateness and applicability of the doctrine of reverse veil piercing. See, e.g., C. Bishop, "Reverse Piercing: A Single Member LLC Paradox," 54 S.D. L.Rev. 199, 230-31 (2009); L. Heilman, comment, "C.F. Trust, Inc. v. First Flight Limited Partnership: Will the Virginia Supreme Court Permit Outside Reverse Veil-Piercing Against a Limited Partnership?," 28 Del. J. Corp. L. 619, 628-29, 636-37 (2003); M. Richardson, comment, "The Helter Skelter Application of the Reverse Piercing Doctrine," 79 U. Cin. L.Rev. 1605, 1623 n. 141 (2011). Additionally, commentary to the Revised Limited Liability Company Act cites to Howell with approval in its discussion of charging orders against limited liability companies. Revised Uniform Limited Liability Company Act (2006) § 503(g), comment, 6B U.L.A. 500 (2008).
[3] The traditional veil piercing doctrine has a long history in the law of business corporations in this state and virtually all other jurisdictions, and generally has been expanded to limited partnerships and, more recently, limited liability companies. See, e.g., Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 187 Conn. 544, 552-53, 447 A.2d 406 (1982) (citing cases in which Connecticut courts have found it appropriate to pierce corporate veil). See generally S. Bainbridge, "Abolishing Veil Piercing," 26 J. Corp. L. 479, 480-513 (2001) (describing history and evolution of veil piercing doctrine). Reverse veil piercing, although considerably less developed and only somewhat recently addressed by the Appellate Court in Howell, also can be traced back nearly one century in other jurisdictions. See, e.g., Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 31 F.2d 265, 267 (2d Cir.1929) (recognizing in very rare circumstances that parent company may be held liable for subsidiary).

Although the plaintiffs argue that our holding in Zaist v. Olson, 154 Conn. 563, 576-78, 227 A.2d 552 (1967), suggests that this court also previously has employed reverse veil piercing, it is unclear from the facts and reasoning in that decision whether that is true. To the extent that Zaist can be read to support the application of the reverse veil piercing doctrine, I would overrule its application of that doctrine for the same reasons that I would overrule the Appellate Court's adoption of it in Howell.
[4] In addition, there is somewhat of an internal, conceptual inconsistency with the reverse veil piercing doctrine. As I noted previously, the test for traditional veil piercing generally requires courts to find that the corporation causing the harmful act was so dominated by the individual shareholder that they became the same for purposes of establishing liability. Yet, if this analysis is properly inverted for a reverse veil piercing claim, a court should be required to find that a shareholder was so dominated by the corporation that they became the same. Cf. Estate of Daily v. Title Guaranty Escrow Service, Inc., 178 B.R. 837, 845 (D.Haw.1995), aff'd mem. sub nom. Estate of Daily v. Lilipuna Associates, 81 F.3d 167 (9th Cir. 1996). Herein lies the conceptual inconsistency, and "it stretches the imagination, not to mention the equities, to conceive of how someone wholly outside the corporation may be used to pierce the corporate veil from within." Id.
[5] There may be one instance in which reverse veil piercing is the only feasible means to adequately satisfy a judgment. When the wrongdoer is also the alter ego of a single member limited liability company, current judgment collection methods may prevent adequate satisfaction of a judgment. Judgment creditors are initially limited to obtaining a charging order against the limited liability company member. See General Statutes § 34-171. This, however, only transfers to the judgment creditor a right to receive distributions; it does not confer membership or voting rights. See General Statutes §§ 34-170 and 34-171. "[T]he transferee then does not become a member in substitution for the only transferring member simply by default. Rather, the transferee must obtain the consent of the transferor to become the only substituted member." C. Bishop, "Reverse Piercing: A Single Member LLC Paradox," 54 S.D. L.Rev. 199, 219 (2009). Simply put, "the transferring member may well insist on continuing as the only rightful member to prevent the creditor from reaching the [limited liability company's] assets. In these cases, the creditor will be effectively precluded from reaching those assets under statutory approaches inherent in ... limited liability company law." Id., at 220. Nevertheless, even if reverse veil piercing would be the only feasible method available, limited liability companies, like corporations, are creatures of statute. It therefore should be within the prerogative of the legislature, rather than the courts, to amend the statutory scheme to allow reverse veil piercing.