******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

NEIL SCARFO *v.* PATRICK SNOW ET AL.
(AC 37794)

Alvord, Prescott and Mullins, Js.

*Argued March 2—officially released September 27, 2016*

(Appeal from Superior Court, judicial district of
Middlesex, Epstein, J.)

*Michael F. Dowley*, with whom, on the brief, was
*Melissa S. Harris*, for the appellant (plaintiff).

*John C. Leary*, for the appellees (named defendant
et al.).

*Opinion*

MULLINS, J. The plaintiff, Neil Scarfo, appeals from the judgment of the trial court, rendered in favor of the defendants, Patrick Snow, Cider Hill Associates, LLC (Cider Hill),[1] Premier Building & Development, Inc., Kane Street Associates, LLC, Cobblestone Associates, LLC, Premier Financial, Inc., Sydney Property Management, LLC, and Premier Development, Inc.[2] On appeal, the plaintiff claims that the court erred in concluding that he did not establish his claims of spoliation of evidence, breach of contract, and breach of fiduciary duty against Snow. Although the trial court authored a well written and thorough memorandum of decision, we, nevertheless, conclude that the form of judgment was improper because the plaintiff lacked standing to assert these claims in his individual capacity, and we reverse the judgment and remand the matter with direction to dismiss the case.

The following extensive facts, as specifically found by the trial court, inform our review. Scarfo "has been a licensed realtor in the State of Connecticut for almost twenty-eight years and works with the Century 21 agency. . . . Snow . . . has been engaged in construction and real estate development for more than twenty years. The parties had known one another for a period of time before [they entered into] the December, 2004 contract . . . . [Scarfo] had an office across the hall from [Snow] at the time of the contract, and the parties continued to have their business offices in the same building, on the same floor, across from one another, for the entire period of time at issue. . . .

"Sometime in 2002 or 2003, Snow saw a Century 21 ad for a 'raw' piece of land for sale in Cromwell. The owner was Evergreen Realty [(Evergreen)]. Snow consulted with a local planning and zoning attorney with regard to a possible project, but there were difficulties with initial proposals. In the spring of 2004, Snow submitted to the Connecticut Secretary of [the] State papers for registering Cider Hill Associates as a limited liability company, partially for insurance and liability reasons, with the intent of development of the property. One of Snow's companies, Premier Development, entered into a purchase agreement for the land from Evergreen in April, 2004. Scarfo had discussed with Snow the possibility of buying a lot in the planned subdivision, but instead decided to become a partner in the project.

"On December 17, 2004, [Cider Hill] filed with the Secretary of [the] State its Articles of Organization.[3] As memorialized in their agreement dated December 30, 2004, Scarfo presented Snow with a cashier's check in the amount of $262,500 on December 17, 2004, and, on December 20, 2004, the closing took place in which [Cider Hill] purchased the property at issue from Ever-

green. As listing agent, Scarfo took a $25,000 commission on the sale of the property, which Snow admits was a reduced commission. . . . Scarfo contends that Snow never contributed his $262,500 share of the initial investment. Snow claims that his work in making all of the arrangements to procure the land, investigation, hiring engineers and soil scientists, planning, and incurring other professional fees before the December, 2004 agreement, amount to costs in the range of $250,000, plus he contributed the option moneys from the November, 2004 agreements.[4] . . .

"On December 30, 2004, [Scarfo] and [Snow] signed a written [operating] agreement [(agreement)], calling themselves 'members,' with each to have a 50 percent interest in Cider Hill . . . . They further agreed that, as of the date of the agreement, the value to each member was one half of the unpaid obligations of the company plus $262,500.

"The agreement obligated each of the members, at the end of each fiscal year, to ascertain a valuation based primarily upon the opinion of the [certified public accountant] retained by the company, and further provided that, if the members could not agree on the valuation, another certified public accountant was to determine the value of the interest. Neither member to the agreement ever provided an accounting and neither member submitted an inquiry for an accounting to a specially nominated accountant during the pendency of the agreement. However, Snow arranged for the accounting firm of Guilmartin, DiPiro & Sokolowski[5] for [Cider Hill] and Michael DiPiro of that firm prepared all of [Cider Hill's] tax returns and [schedule K-1 tax forms]. One might find that this revealed Snow's compliance with the 'accounting' portion of the agreement mentioned . . . .

"In an 'Amendment' to the agreement, also dated December 30, 2004, the parties stated that each of them was contributing 'real property to [Cider Hill] with an agreed upon value of $262,500.' [Scarfo] and [Snow] further agreed that they would obtain financing to complete the acquisition of real property to develop a project in the estimate amount of $1,500,000, and they further agreed to divide equally the costs associated with debt service, taxes, and other expenses. The only specific delineation of responsibilities to either of the partners was that . . . Snow was to be responsible to 'obtain all required approvals, including but not limited to subdivision approvals, planning and zoning approval, permitting, Cromwell approvals, Department of Transportation approvals, architectural rendering.' . . .

"There has been no allegation that Snow did not perform these duties. Instead, [Scarfo] has alleged in his amended complaint . . . that Snow was the 'managing partner' and [and that he] failed to value the membership annually, failed to notify [Scarfo] of the value of

his membership interest, failed to obtain bids, and failed to distribute profits from the sale of the lots on the development property [in breach of the amended agreement].

"Neither the agreement, nor the [December 30, 2004] amendment . . . renders [Snow] the 'manager' of the property. Nor does the agreement require [Snow] to determine a value of the membership and provide it to [Scarfo]. Indeed, each partner had that responsibility to the other. Except for the annual tax returns and K-1s provided by the [Cider Hill] accountant, neither party did so and neither inquired of the other.

"Two other provisions of this agreement specifically applicable to this litigation are paragraphs 7 and 8, which provide:

"7. All aspects of the construction of the housing units and related structures shall be performed by PREMIER BUILDING & DEVELOPMENT, INC., at a cost plus 5 [percent]. [Cider Hill] shall obtain [three] bids for this work to estimate the fair market value of this work and to agree on the cost of said work.

"8. The cost of work performed by PREMIER BUILDING & DEVELOPMENT, INC., or its affiliates or assigns, and PATRICK SNOW, or his affiliates or assigns, shall be paid from the proceeds of the construction loan as customary . . . .

"Scarfo contends that he entered the agreement because he relied on a preliminary budget prepared by Snow, which reflected expenditures of $1,727,100. The agreement does not make any mention of budgets or reliance thereon. In addition, neither the agreement nor any other document provides any guarantee of profit nor pay-back to an investor in the event of going over budget. Nor does the agreement provide that lots should sell at a certain price or that the partner who actually was negotiating the sale of the lots could not exercise discretion in the sale, depending on the benefit to [Cider Hill] or the difficulty in selling any particular lot on the property.

"Snow devoted full-time effort to the development of the [Cider Hill] subdivision and sale of the properties. While he was not designated by the parties in their agreement as the 'managing partner,' he was the only one of the two equal partners who worked on developing the property, engaging engineers, pavers, landscapers, etc.; procuring estimates; considering the contractors and providers to be hired and used, etc.; negotiating the necessary arrangements and business transactions, as well as the loans; and, preparing for and procuring necessary approvals from appropriate authorities. In essence, he was the 'de facto' managing member, or the operation would never have even begun to get under way. Snow never received any salary or compensation for his efforts.

"In November, 2005, the Town of Cromwell Planning and Zoning Commission approved the subdivision, with special and general conditions. In 2006, lots began to be sold; indeed approximately twelve of the twenty-three lots were sold in that year. The number decreased in 2007 and 2008. The real estate market, which had been 'on a roll,' began the tumultuous decline from which we are only now beginning to recover, just as is the general economy. As Snow testified, he had high hopes in 2004, and before 2008, he never expected a loss. In an undated supplementary budget, proposed expenditures had increased to $2,979,050. This was prepared by Snow, and Scarfo did not ask any questions about it. Snow testified that the property proved to be a very difficult site on which to work. Among other things, trees had to be cleared, there were inclines and declines, a hill, the necessity of the construction of a retaining wall, the soil was a type that was difficult to control and had to be moved.

"The income tax returns for [Cider Hill] reflect the following: 2004—no gross receipts or sales; 2005—loss of $455; 2006—profit of $166,705; 2007—loss of $98,501; 2008—loss of $230,048; 2009—loss of $13,845; 2010—loss of $157,472, and, 2011—loss of $20.

"Snow's 'bookkeeping' and 'records' keeping in this project [were] unique. According to Kathy Lehman, the woman who was his bookkeeper, customer service representative and office manager for seven years until 2010, each lot in the twenty-three lot [Cider Hill] subdivision had its own folder, containing the plot plan and closing documents. The records produced at trial certainly confirm that. Invoices from subcontractors were placed in a 'to be paid' pile and she never paid any bill without an invoice. Thereafter, the payment set-up got confusing. [Cider Hill] did not have a credit card and had little in the way of equity at its commencement. In order to benefit from the delay of having to pay immediately, Snow took advantage of the sixty day payment plan for vendors [and] on various of the other entities' and Snow's credit cards, and those cards were used to pay [Cider Hill] bills. Snow would then later make the credit card payments. Whenever Snow needed to be reimbursed for an expenditure, he would give Ms. Lehman the receipt. According to Ms. Lehman, the credit card statements were at the office when she left.

"In the early portion of its existence, [Cider Hill] used a [particular] software package . . . [but], by the time of the commencement of this litigation, it was no longer accessible. [Cider Hill] then changed to Quick Books.

"Neither Scarfo nor any of his Century 21 colleagues assisted in the sale of any of the lots in the development. In late 2008, or early in 2009, Snow advised Scarfo that he thought that they would come in under budget. Subsequently, however, when Snow advised Scarfo that

such was not the case and that there would not be a profit, Scarfo initiated this lawsuit.

"According to Ms. Lehman, Scarfo never asked her for any documents or made any inquiries about [Cider Hill] or Snow until 2009, when she provided Scarfo documents in response to a request he made to her.

"[Scarfo] alleges that the equities favor him because of numerous discrepancies [that] he and his experts are unable to resolve at this time and because of his belief that the defendant was self-dealing. There is no question in this court's mind that the evidence in this case presents examples of what one might consider unorthodox ways of making and keeping records. It may go beyond 'sloppy,' however, the evidence does not reveal that there was an intent to deceive or hide or self-deal.

"One of the major complaints raised by Scarfo is that Snow authorized 'credits' on the sale of lots in the subdivision without authorization.[6] Scarfo does not point to any portion of the agreement, however, that requires the partner working on the project to not be able to exercise discretion in his attempts to move the property.

"Scarfo also complains that he only signed one of the 'consent' forms for the sale of the properties and that was at a fax request of the closing attorney when Scarfo was in Florida. These forms listed the sales price terms, including credits, for each lot in the subdivision. Scarfo contends that he did not sign the other forms [that] appear to have his signature. Snow denies that he affixed that signature. No handwriting expert testified, and the court has no idea as to how these consent forms were signed. Scarfo contends that he would never have approved these credits had he known about them. These forms, however, together with all of the other closing documents . . . were all available to Scarfo at any time during the course of the tenure of the contract. In addition, Scarfo, having been in the real estate business for more than twenty-five years, knew of the necessity of such documents, and if he did not, he certainly was alerted to that when he was asked to fax his signature by the [Cider Hill] attorney at one of the closings.

"Scarfo also contends that the agreement was breached because three written bids were not procured for each phase of the project. The agreement does not call for bids to be 'written.' In addition, the credible testimony reveals that the [three bid] rule was usually abided by and that, in his many years of experience, Snow had established relationships with vendors and subcontractors who were reliable, competent, and provided work and goods at competitive prices.

"[Scarfo's] expert, [certified public accountant] Michael Sobol, was retained in 2013. At trial, he testified

that 'his firm' reviewed every item in the five boxes of documents produced in discovery in this case, delivered to [Scarfo's] counsel in 2011 or 2012. Mr. Sobol explained that, with regard to the documents which were 'some eight years after the events took place,' he and his office tried to 'get our heads around what transpired from an accounting perspective.' He expected to find matching invoices or similar documents and accounts for all transfers and expenditures made, but was not able to do so. As an example, Mr. Sobol stated that, while he saw disbursements to [Connecticut Light and Power], he would find it an unsupported disbursement unless he could find an invoice. As another example, Mr. Sobol could not match expenditures for General Paving, but a document shown to him in court revealed a good portion of the amount paid was indeed for that entity. There were, however, many other discrepancies for which there was no identifiable vendor or service provider.

"Mr. Sobol testified that all of the credit card statements were not in the materials delivered from [Snow], but he also admitted that, even if he had all of the credit card statements, he might not be able to identify the vendor or service provider. Mr. Sobol concluded that the fact that disbursements were unsupported did not mean that they were inappropriate or unauthorized. Clearly, Mr. Sobol found, and this court cannot disagree, that as of the time of the delivery of these documents, they did not reveal the pristine accounting or documentation that was desired, nor did the document production even come close to it. The records at this point in time were certainly not in good order or well maintained. However, Mr. Sobol, [Scarfo's] own expert, testified that he could not say that there was unrealized profit for which Scarfo was entitled to payment.

"In 2011, the town of Cromwell brought a civil action against [Cider Hill] and General Paving and Construction Corp[oration (General Paving)], alleging that [they] failed to construct properly certain public improvements within the subdivision in accordance with the plans that had been filed and approved [(Cromwell action)]. There is dispute about how and when Scarfo learned about [the Cromwell action]. Scarfo testified that [he first learned of that action when he read] about it in the newspaper. Snow contends that he approached Scarfo, advising him not only of the suit, but also asking him to advance his share of the funds necessary to defend [that action] and proceed against General Paving. It was Snow's belief that [Cider Hill] could prevail in its claim that General Paving was responsible to the town of Cromwell and to [Cider Hill]. Because neither he nor [Cider Hill] had the financial resources to hire counsel, Snow asked Scarfo to contribute to legal representation costs. By this time, the [present] litigation had commenced and, on the advice of counsel, Scarfo refused to contribute and also refused the choice of

[Snow's] counsel in the [present] lawsuit as counsel to represent [Cider Hill] in the Cromwell [action] and the proposed claims against General Paving. The town of Cromwell was requiring the repair to the roads; [Cider Hill] could not do it; and General Paving refused to do it. Snow agreed to forfeit the bond and have the town correct the problem, and a default judgment entered against [Cider Hill]. In his counterclaim, Snow asserts breach of contract, breach of fiduciary duty and negligence claims against Scarfo for refusing to contribute to legal costs [arising out of the Cromwell action]." (Footnotes altered.)

The court also found that there remained many unanswered questions after the close of evidence, and it stated that it had "much doubt about the veracity of" either Scarfo or Snow. Furthermore, the court opined: "The complexity of the issues in this case arise from the various allegations the parties have made, the very confusing and manipulative way in which [Snow] conducts his business(es), and the complete lack of any attention whatsoever by [Scarfo] to the subdivision development [that] is the subject of this lawsuit, as well as a complete lack of any attention at all by [Scarfo] to the partnership or the business on which he premises his contentions that he is now entitled to damages and other relief."

On the basis of these findings and astute observations, the court concluded that the plaintiff had failed to establish any of his causes of action, and it rendered judgment in favor of the defendants.[7] This appeal followed.[8]

Following appellate briefing and oral argument, we, sua sponte, issued the following supplemental briefing order: "The parties are hereby ordered to file simultaneous supplemental briefs of no more than ten pages within ten days of issuance of notice of this order to address the following issue:

"1. Whether the plaintiff has standing to maintain this suit in his individual capacity. See *Smith* v. *Snyder*, 267 Conn. 456, 460–63, 839 A.2d 589 (2004); *Padawer* v. *Yur*, 142 Conn. App. 812, 66 A.3d 931 [cert. denied, 310 Conn. 927, 78 A.3d 146] (2013); see also *Calpitano* v. *Rotundo*, Superior Court, judicial district of New Britain Docket No. CV-11-6008972 (August 3, 2011) (52 Conn. L. Rptr. 464); *Ward* v. *Gamble*, Superior Court, judicial district of Hartford, Docket No. CV-08-5017829 (July 23, 2009) (48 Conn. L. Rptr. 286).

"The parties are further ordered to include in their supplemental briefs an analysis of the following matters:

"A. Based on the allegations throughout the complaint that the defendant Snow breached the operating agreement and amendment thereto of Cider Hill . . . which documents were signed and entered into by

Scarfo and Snow as duly authorized members of Cider Hill, what, if any, injury has the plaintiff incurred individually that is distinct and separate from the alleged injury to Cider Hill.

"B. What is the basis for the plaintiff's standing to raise a claim that Snow breached his alleged fiduciary duty to Cider Hill and to the individual plaintiff by breaching the operating agreement of Cider Hill, and the amendment thereto, and by self-dealing.

"C. Whether the plaintiff has standing to raise a claim of spoliation of evidence, which specifically alleges as its basis, that Snow failed to preserve evidence despite knowing that he had 'obligations to the plaintiff and [Cider Hill] under the December 30, 2004 [operating] agreement and amendment dated December 30, 2004.' "

The parties, thereafter, submitted their supplemental briefs.

In his supplemental brief, the plaintiff contends that he has standing, individually, to maintain his direct causes of action because he is claiming a direct rather than a derivative injury. The plaintiff then specifies the particular parts of the amended operating agreement he alleges Snow violated and how he sustained direct injury, separate and apart from any injury to Cider Hill. For example, the plaintiff argues: "The [amended] agreement between [the] plaintiff and . . . Snow regarding capital contributions created personal duties and obligations under the operating agreement to each other. The claim is direct because it arises from a special relationship, [namely,] the contractual relationship between [the] plaintiff and . . . Snow. . . . The agreement between [the] plaintiff and . . . Snow to divide equally the costs and expenses of the company created a joint duty and obligation wherein [the] plaintiff has a right to contribution/damages." Specifically as to his breach of fiduciary duty claim, the plaintiff argues that he has standing to raise a direct claim because his "claim is for express and continuing breaches of personal duties and obligations under the [amended] agreement by . . . Snow and not general fiduciary duties and obligations to the company . . . ." He also contends that he has "standing to raise [a] claim that . . . Snow breached his fiduciary duty to defendant [Cider Hill] and [to the] plaintiff, individually, by breaching the operating agreement and [the] amendment [thereto] by self-dealing." We disagree that these are direct injuries, and we conclude that the plaintiff did not have standing in his individual capacity to maintain his various causes of action and that the trial court should have dismissed his case.

"It is axiomatic that a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. . . . Standing is the legal right to set judicial machinery in motion. . . .

Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. . . . [I]f the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. [When], for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them. . . .

"A limited liability company is a distinct legal entity whose existence is separate from its members. . . . [It] has the power to sue or to be sued in its own name; see General Statutes §§ 34-124 (b) and 34-186; or may be a party to an action brought in its name by a member or manager. . . . A member or manager, however, may not sue in an individual capacity to recover for an injury based on a wrong to the limited liability company. . . . [A] member or manager of a limited liability company is not a proper party to a proceeding by or against a limited liability company solely by reason of being a member or manager of the limited liability company, except where the object of the proceeding is to enforce a member's or manager's right against or liability to the limited liability company or as otherwise provided in an operating agreement . . . ." (Internal quotation marks omitted.) *Padawer* v. *Yur*, supra, 142 Conn. App. 817–18.

In the present case, Snow filed articles of organization for Cider Hill with the Secretary of the State's Office on December 17, 2004, listing himself as the agent for service of process and listing his title as "Mem/Mgr." Snow also listed Scarfo as a "Member" of Cider Hill. The nature of the business to be transacted by Cider Hill is listed as "[a]ny lawful business that may be carried on under the Limited Liability Act." Question five of the articles of organization form provides:

"MANAGEMENT

"(Place a check mark next to the following statement *only* if it applies.)

"_____ The management of the limited liability company shall be vested in one or more managers." (Emphasis in original.) There is no check mark in question five.

On December 30, 2004, Scarfo and Snow then entered into a written operating agreement for Cider Hill and an amendment thereto. The agreement provides that Scarfo and Snow each were 50 percent members of Cider Hill. The amendment specifically states that it was drafted for the purpose of "memorializ[ing] their agreement regarding the division of labor and expenses regarding the development of the property on Evergreen Road in Cromwell . . . ." Both Scarfo and Snow each signed the original operating agreement as a

"Member" of Cider Hill. They each then signed the amendment to the Cider Hill operating agreement as "Its Member, Duly Authorized."

On October 27, 2009, Scarfo brought a six count amended complaint against Snow and Cider Hill alleging damages, breach of fiduciary duty, and spoliation of evidence, as well as requesting an accounting and an opportunity to pierce the corporate veil of the various defendant companies in which Snow was a participant, including Cider Hill. The complaint was based upon Snow's alleged breaches of the amended agreement regarding the Evergreen Road development (Evergreen Project). The court found that Scarfo had failed to prove his causes of action, and it rendered judgment in favor of the defendants. Although neither the trial court nor the parties questioned the issue of the plaintiff's standing in this case, we requested supplemental briefing on that issue, and we now conclude that the plaintiff did not have standing in his individual capacity to maintain this suit.

"Our common law does not recognize [limited liability companies], which were first created by statute in Connecticut in 1993. Public Acts 1993, No. 93-267. [A limited liability company] is a distinct type of business entity that allows its owners to take advantage of the pass-through tax treatment afforded to partnerships while also providing them with limited liability protections common to corporations. . . . The [Limited Liability Company Act, General Statutes § 34-100 et seq.] establishes the right to form [a limited liability company] and all of the rights and duties of the [limited liability company], as well as all of the rights and duties of members and assignees. It permits the members to supplement these statutory provisions by adopting an operating agreement to govern the [limited liability company's] affairs." (Citations omitted.) *Styslinger* v. *Brewster Park, LLC*, 321 Conn. 312, 317,      A.3d.      (2016). "A limited liability company . . . is a hybrid business entity that offers all of its members limited liability as if they were shareholders of a corporation, but treats the entity and its members as a partnership for tax purposes. All [fifty] states and the District of Colombia have enacted [limited liability company] legislation, and every state has adopted or is considering its own distinct [limited liability company] act."[9] (Footnotes omitted.) Annot. 48 A.L.R. 6th 1, § 2 (2009 and Supp. 2016); see General Statutes § 34-100 et seq.

"A limited liability company is a distinct legal entity whose existence is separate from its members. . . . A limited liability company has the power to sue or be sued in its own name . . . or may be a party to an action through a suit brought in its name by a member. . . . A member may not sue in an individual capacity to recover for an injury the basis of which is a wrong to the limited liability company." (Citations omitted.)

*Wasko* v. *Farley*, 108 Conn. App. 156, 170, 947 A.2d 978, cert. denied, 289 Conn. 922, 958 A.2d 155 (2008).

"A corporation is a separate legal entity, separate and apart from its stockholders. . . . It is an elementary principle of corporate law that . . . corporate property is vested in the corporation and not in the owner of the corporate stock. . . . That principle also is applicable to limited liability companies and their members." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 147, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002).

"[T]he law [permits] shareholders to sue derivatively on their corporation's behalf under appropriate conditions. . . . [I]t is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding secondarily, deriving his rights from the corporation which is alleged to have been wronged. . . . [I]n order for a shareholder to bring a direct or personal action against the corporation or other shareholders, that shareholder must show an injury that is separate and distinct from that suffered by any other shareholder or by the corporation. . . . It is commonly understood that [a] shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Snyder*, 267 Conn. 456, 461, 839 A.2d 589 (2004).

"[A] derivative suit is an action brought on behalf of a corporation by some percentage of its shareholders. . . . [In many of these actions, the] corporation is in an anomalous position of being both a defendant and a plaintiff in the same action. This unusual posture for the corporation is the result of the historical evolution of the derivative suit. At common law, there was no action in law permitting a shareholder to call corporate managers to account. . . . In equity, there were two actions that evolved into a single derivative action: in one action the corporation was named as a defendant in order to compel it to take action against its controlling officers; in the second, the shareholder maintained an action against the officers and directors of the corporation, on behalf of the corporation. The dual actions were cumbersome and evolved into the present day unitary derivative action. . . . A shareholder's derivative suit is an equitable action by the corporation as the real party in interest with a stockholder as a nominal plaintiff representing the corporation. . . . It is designed to facilitate holding wrongdoing directors and majority shareholders to account and also to enforce corporate claims against third persons. . . .

"The use of a nominal plaintiff in a derivative action makes it an unusual procedural device by reason of its dual nature in that it consists of the basic cause of

action, which pertains to the corporation and on which the corporation might have sued, and the derivative cause of action, based upon the fact that the corporation will not or cannot sue for its own protection. . . . Thus the dual nature of the stockholder's action: first, the plaintiff's right to sue on behalf of the corporation, and, second, the merits of the corporation's claim itself." (Citations omitted; internal quotation marks omitted.) *Ma'Ayergi & Associates, LLC* v. *Pro Search, Inc.*, 115 Conn. App. 662, 668–69, 974 A.2d 724 (2009).

Pursuant to General Statutes § 34-187: "(a) Except as otherwise provided in an operating agreement, suit on behalf of the limited liability company may be brought in the name of the limited liability company by: (1) Any member or members of a limited liability company, whether or not the articles of organization vest management of the limited liability company in one or more managers, who are authorized to sue by the vote of a majority in interest of the members, unless the vote of all members shall be required pursuant to subsection (b) of section 34-142; or (2) any manager or managers of a limited liability company, if the articles of organization vest management of the limited liability company in one or more managers, who are authorized to sue by the vote required pursuant to section 34-142.

"(b) In determining the vote required under section 34-142 for purposes of this section, the vote of any member or manager who has an interest in the outcome of the suit that is adverse to the interest of the limited liability company shall be excluded."[10]

"[Section] 34-187 applies to all limited liability companies unless the operating agreement provides for a different rule that conflicts with the statute or provides that the statute does not apply at all. That is the plain meaning of the statutory language, "[e]xcept as otherwise provided . . . . Thus, if the operating agreement is silent as to the applicability of the statute, the statute controls. . . . In other words . . . the statutory scheme controls and provides for the default method of operation, unless the organizers or members of the limited liability company contract, through the operating agreement, for another method of operation. Indeed, this is one of the foundational principles of the law governing limited liability companies." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 836–37, 43 A.3d 607 (2012).

In the present case, the plaintiff brought a direct action against the only other member of Cider Hill, against Cider Hill itself, and against other companies in which Snow had an interest. He alleges various causes of action flowing from an alleged breach of a fiduciary type duty and a breach of the amended operating agreement, which was signed by the plaintiff

and Snow, specifically *as agents for Cider Hill.* See *Chila* v. *Stuart*, 81 Conn. App. 458, 464, 840 A.2d 1176 ("[i]t is axiomatic that an action upon a contract or for breach of a contract can be brought and maintained by one who is a party to the contract sued upon" [internal quotation marks omitted]), cert. denied, 268 Conn. 917, 847 A.2d 311 (2004). Indeed, neither the plaintiff nor Snow were parties to the agreement in their individual capacities.

The plaintiff contends that Snow essentially mismanaged the Evergreen Project. Although the plaintiff contends that he suffered direct injury by the alleged action or inaction of Snow, any benefit he would have received from the Evergreen Project, were it not for the alleged improprieties of Snow, would have flowed to him only through Cider Hill, first benefiting Cider Hill. Accordingly, if there was an injury, that injury was sustained by Cider Hill and then sustained by the plaintiff. Thus, the plaintiff's injury is not direct, and he has no standing to sue in his individual capacity. See *Padawer* v. *Yur*, supra, 142 Conn. App. 817 (member or manager may not sue in individual capacity to recover for injury based on wrong to limited liability company); *O'Reilly* v. *Valletta*, 139 Conn. App. 208, 216, 55 A.3d 583 (2012) (same), cert. denied, 308 Conn. 914, 61 A.3d 1101 (2013); *Wasko* v. *Farley*, supra, 108 Conn. App. 170 (same).

The form of the judgment is improper, the judgment is reversed, and the case is remanded with direction to dismiss the case for lack of subject matter jurisdiction.

In this opinion the other judges concurred.

[1] Cider Hill is owned by both the plaintiff and Snow. After Snow's attorney filed an appearance with the trial court on behalf of all defendants, the plaintiff filed a motion to disqualify counsel from representing Cider Hill on the ground that, as a 50 percent owner of the company, he had not agreed to counsel's representation. On May 5, 2010, the trial court granted that motion, and Cider Hill was no longer represented. Cider Hill is listed on the trial court docket as "nonappearing." It also has not participated in this appeal.

[2] Snow is a participant in each of the defendant companies.

[3] The articles of organization were executed by Snow, who was listed as the statutory agent for service of process. The document listed Snow's title as "Mem/Mgr" and Scarfo's title as "Member." The document also contained a box that the preparer was to check if management of the company was vested in a manager or managers. That box was not checked.

[4] The court stated the following: "For example, in November, 2004, in option agreements with three tile vendors with whom Snow had had previous dealings, Snow agreed to provide them with reduced lot purchase prices for payment of $50,000 each at the time of the making of the agreement. Two of those were later returned by [Cider Hill]."

[5] According to the trial court: "Snow engaged this particular [accounting] firm because it was Scarfo's accounting firm, and Scarfo had asked Snow to retain that firm for [Cider Hill]."

[6] The trial court stated: "For example, in November, 2004, in option agreements with three tile vendors with whom Snow had had previous dealings, Snow agreed to provide them with reduced lot purchase prices for payment of $50,000 each at the time of the making of the agreement. Two of those were later returned by [Cider Hill]."

[7] Snow also had filed counterclaims in this case, upon which the court found in favor of Scarfo. This aspect of the judgment is not relevant to this appeal.

[8] In this appeal, the plaintiff's claims are twofold. First, the plaintiff claims: "The trial court erred in failing to apply the appropriate standard with regard

to the spoliation of evidence, [and it] erred in failing to find that [the] plaintiff established a rebuttable presumption that but for the fact of spoliation of evidence, [the] plaintiff would have recovered [on his claims]." Second, the plaintiff claims that "the trial court erred in failing to apply the appropriate standard with regard to breach of fiduciary duty" in a limited liability company. He argues that "[t]he court failed to recognize that, by the very nature of a limited liability company, a fiduciary duty between members exists." He argues: "Where there is no dispute that Scarfo and Snow were members, Scarfo and Snow had a fiduciary relationship to one another, and the trial court should have shifted the burden to Snow to prove fair dealing by clear and convincing evidence." The plaintiff's claim of breach of fiduciary duty was based on Snow's alleged breach of the amended agreement.

As to the plaintiff's claim of spoliation of evidence, the trial court specifically found: "While the evidence clearly reflects discrepancies and very poor recordkeeping or retention many years after the inception of this project, the credible evidence does not reveal any intentional destruction or hiding of materials needed for litigation." We note that during oral argument before this court, the plaintiff clearly stated that he was not contesting the court's factual findings in this case, and that his appeal concerned only matters of law.

As to the plaintiff's claim of breach of fiduciary duty, the trial court specifically found: "[T]hese partners were equal in every way whatsoever, and Scarfo was not precluded in any way from avoiding the alleged difficulties about which he is now complaining. There has not been any breach of fiduciary duty by the defendant."

As to the plaintiff's claim for breach of the amended agreement, the court specifically found: "The court cannot find that Snow violated the terms of the contract. Furthermore, while there has been a great deal of innuendo, the evidence does not support the contention that Snow did not fulfill his responsibilities . . . ."

We reiterate that, during oral argument, the plaintiff clarified that he was not challenging any of the trial court's factual findings. He specifically stated that his appeal is one of law and that he is not trying to relitigate the facts.

[9] "[A] number of states have adopted or substantially adopted the Uniform Limited Liability Company Act (ULLCA) . . . . According to the ULLCA, a member of a member-managed [limited liability company] owes to the company and the other members the fiduciary duties of loyalty and care, and a member in a member-managed [limited liability company] or a manager-managed [limited liability company] shall discharge the duties under the ULLCA or under the operating agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing." (Footnotes omitted.) Annot. 48 A.L.R. 6th 1, § 2 (2009 and Supp. 2016).

Although Connecticut previously had not adopted the ULLCA, our governor, on June 2, 2016, signed into law Substitute House Bill No. 5259, 2016 Sess., codifying what will be known as the Connecticut Uniform Limited Liability Company Act. Public Acts 2016, No. 16-97. This law will take effect on July 1, 2017, and it makes substantial changes to our current law.

We also note the existence of the Prototype Limited Liability Company Act (Prototype Act), which was drafted by the Working Group on the Prototype Limited Liability Company Act, Subcommittee on Limited Liability Companies Committee on Partnerships and Unincorporated Business Organizations Section of Business Law American Bar Association in 1992. See 3 L. Ribstein & R. Keatinge, Ribstein and Keatinge on Limited Liability Companies (June 2016 Ed.) Appendix C; see also J. Burkhard, "Resolving LLC Member Disputes in Connecticut, Massachusetts, Pennsylvania, Wisconsin, and the Other States that Enacted the Prototype LLC Act," 67 Bus. Law. 405, 416–18 (2012) (explaining that Connecticut modeled its limited liability company statutes on Prototype Act but that Connecticut courts have treated claims as derivative actions, similar to claims by corporations, in apparent contravention of Prototype Act). The parties do not rely on either the ULLCA or the Prototype Act in their supplemental briefs, and we, accordingly, do not discuss them directly in addressing the issue of standing.

[10] Here, it appears that the plaintiff may have had the ability to bring suit in the name of Cider Hill without the need for a vote of members to authorize suit on behalf of Cider Hill; see General Statutes § 34-187 (b); because the only other member was Snow, who, obviously would have an interest in the outcome of the suit that is likely adverse to the interest of Cider Hill. A thorough review of the operating agreement also reveals that there was no part of that agreement that addressed § 34-187 or any procedure for filing suit for alleged wrongdoing.